CALIFANO, SECRETARY OF HEALTH, EDUCATION, AND WELFARE *v.* WESTCOTT ET AL.

No. 78–437.   Argued April 16, 1979—Decided June 25, 1979*

---

*Together with No. 78–689, *Pratt, Commissioner, Department of Public Welfare of Massachusetts* v. *Westcott et al.,* also on appeal from the same court.

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, WHITE, MARSHALL, and STEVENS, JJ., joined. POWELL, J., filed an opinion concurring in part and dissenting in part, in which BURGER, C. J., and STEWART and REHNQUIST, JJ., joined, *post*, p. 93.

*William H. Alsup* argued the cause for appellant in No. 78–437. On the brief were *Solicitor General McCree* and *Sara*

*Sun Beale.* *Paul W. Johnson,* Assistant Attorney General of Massachusetts, argued the cause for appellant in No. 78–689. With him on the briefs were *Francis X. Bellotti,* Attorney General, and *S. Stephen Rosenfeld,* Assistant Attorney General.

*Henry A. Freedman* argued the cause for appellees in both cases. With him on the brief for appellees Westcott et al. were *Kenneth P. Neiman* and *Michael B. Trister.* *Solicitor General McCree* filed a brief for the federal appellee in No. 78–689.†

Mr. Justice Blackmun delivered the opinion of the Court.

Section 407 of the Social Security Act, 75 Stat. 75, as amended, 42 U. S. C. § 607, part of the Aid to Families with Dependent Children program, provides benefits to families whose dependent children have been deprived of parental support because of the unemployment of the father, but does not provide such benefits when the mother becomes unemployed. The United States District Court for the District of Massachusetts held that this distinction violates the Due Process Clause of the Fifth Amendment, and ordered that benefits be paid to families deprived of support because of the unemployment of the mother to the same extent they are paid to families deprived of support because of the unemployment of the father. 460 F. Supp. 737 (1978). In these appeals, the Secretary of the Department of Health, Education, and Welfare (HEW), in No. 78–437, challenges the holding on the constitutionality of § 407, but does not question the relief ordered by the District Court; the Commissioner of the Massa-

---

†*Ruth Bader Ginsburg, Diana A. Steele, Phyllis N. Segal,* and *Nancy Duff Campell* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance in both cases.

*Stephan Landsman, Anthony Touschner, Charles E. Guerrier,* and *Barbara Kaye Besser* filed a brief for Cathy Stevens et al. as *amici curiae* urging affirmance in No. 78–437.

chusetts Department of Public Welfare (DPW), in No. 78–689, acquiesces in the decision on the merits, but contests the relief.

I

The Aid to Families with Dependent Children (AFDC) program, 49 Stat. 626, as amended, 42 U. S. C. § 601 *et seq.,* provides financial assistance to families with needy dependent children. The program is administered by participating States, in conformity with federal standards, and is financed by the Federal Government and the States on a matching-funds basis. *King* v. *Smith,* 392 U. S. 309, 316–317 (1968); *Shea* v. *Vialpando,* 416 U. S. 251, 253 (1974).

As originally enacted in 1935, the AFDC program provided benefits to families whose dependent children were needy because of the death, absence, or incapacity of a parent. *Batterton* v. *Francis,* 432 U. S. 416, 418 (1977). This provision, which forms the core of the AFDC program today, is gender neutral: benefits are available to any family so long as one parent of either sex is dead, absent from the home, or incapacitated, and the family otherwise meets the financial requirements of eligibility. 42 U. S. C. § 606.

In 1961, and again in 1962, Congress temporarily extended the AFDC program to provide assistance to families whose dependent children were deprived of support because of a parent's unemployment. *Batterton* v. *Francis,* 432 U. S., at 419; *Philbrook* v. *Glodgett,* 421 U. S. 707, 709–710 (1975). Again, this provision was gender neutral. A "dependent child," for purposes of determining eligibility for AFDC benefits, was defined to include "a needy child . . . who has been deprived of parental support or care by reason of the unemployment . . . of *a parent.*" 75 Stat. 75 (emphasis added).

In 1968, as part of a general revision of the Social Security Act, Congress made this extension permanent. In so doing, however, it added a gender qualification to the statute. The

definition of "dependent child" in § 407 was amended to include a "needy child . . . who has been deprived of parental support or care by reason of the unemployment . . . of his *father.*" 42 U. S. C. § 607 (a) (emphasis added). This portion of the AFDC program is known as Aid to Families with Dependent Children, Unemployed Father (AFDC–UF). Although all 50 States have chosen to participate in the basic AFDC program, only 26 States (plus Guam and the District of Columbia) take part in the AFDC–UF program. One of these is the Commonwealth of Massachusetts.

Appellees are two couples who, it is stipulated, satisfy all the requirements for AFDC–UF benefits [1] except for the requirement that the unemployed parent be the father. Cindy and William Westcott are married and have an infant son. They applied to the Massachusetts DPW for public assistance, but were informed that they did not qualify because William, who was unable to find work, had not previously been employed for a sufficient period to qualify as an "unemployed" father under the Act and applicable regulations. Cindy, until her recent unemployment, was the family breadwinner, and would have satisfied the "unemployment" criteria had she been male.

Susan and John Westwood are also married and have an

---

[1] To be eligible for benefits under the AFDC–UF program, a family must meet both financial and categorical requirements. The financial requirements are determined by the participating States, and vary widely from one State to another. *Rosado* v. *Wyman,* 397 U. S. 397, 408–409 (1970). The categorical requirements, however, are largely determined by the Federal Government. The Act itself specifies that the father must have had 6 or more quarters of work in any 13-quarter period ending within one year prior to the application for aid, and must be currently employed for less than 100 hours per month. 42 U. S. C. § 607 (b) (1) (C). In addition, § 407 of the Act gives the Secretary of HEW authority to promulgate regulations further defining the "unemployment" that will render a family eligible for AFDC–UF benefits. *Batterton* v. *Francis,* 432 U. S. 416, 425 (1977). The regulations, like the statute, speak in terms of the unemployment of the "father." 45 CFR § 233.100 (a) (1) (1978).

infant son. They applied for Medicaid benefits as a family eligible for, but not receiving, AFDC–UF benefits.[2] They, too, were turned down on the ground that John's prior work history was insufficient. Susan, like Cindy Westcott, had been the family breadwinner before losing her job, and would have qualified the family for benefits had she been male.

Appellees instituted this class action in the United States District Court for the District of Massachusetts, naming as defendants the Secretary of HEW and the Commissioner of the DPW. Appellees alleged that § 407 and its implementing regulations discriminate on the basis of gender in violation of the Fifth and Fourteenth Amendments. They sought declaratory and injunctive relief.

The District Court certified the case as a class action,[3] and granted appellees' motion for summary judgment. 460 F. Supp. 737 (1978). The court found that the gender qualification of § 407 was not substantially related to the achievement of any important governmental interests. 460 F. Supp., at 748–751. It was, rather, the product of an "archaic and overbroad generalization"—that "mothers in two parent families

---

[2] In States that participate in both the AFDC program and the Medicaid program, 42 U. S. C. § 1396 et seq., individuals who qualify for AFDC benefits are also entitled to receive Medicaid benefits. § 1396a (a)(10).

[3] The class was defined as

"those Massachusetts families with two parents in the home and with minor dependent children, born or unborn, who would otherwise be eligible for AFDC under Massachusetts' AFDC program, and hence Medicaid as well, but for the sex discrimination in the federal statute [42 U. S. C. § 607] and Massachusetts regulations [6 CHSR III, Subch. A, Pt. 301, § 301.03; Pt. 303, Subpt. A, §§ 303.01 & 303.04] which provide for the granting of federally funded AFDC and Medicaid to families deprived of support because of the unemployment of their father, but not to families deprived of support because of the mother's unemployment." App. to Juris. Statement in No. 78–437, pp. 39A–40A.

The Secretary does not contest the class certification. Juris. Statement in No. 78–437, p. 5 n. 4.

are not breadwinners, so that loss of their earnings would not substantially affect the families' well being." *Id.*, at 751. The court accordingly declared § 407 unconstitutional "insofar as it establishes a classification which discriminates . . . solely on the basis of sex." 460 F. Supp., at 754.

The District Court then turned to the question of relief. The court saw two remedial alternatives: a simple injunction against further operation of the AFDC–UF program, or extension of the program to all families with needy children where *either* parent is unemployed. *Id.*, at 753. The court decided that extension, rather than nullification, was the proper remedial course; it noted the strength of Congress' commitment to the "specific goal of assisting needy children," and emphasized that if provision of benefits "were halted because of the constitutional defect, many persons would lose their very means of subsistence." *Id.*, at 753–754. The court therefore, by order dated April 20, 1978, enjoined the Commissioner from refusing to grant benefits to families made needy by the unemployment of the mother "in the same amounts and under the same standards" as he grants benefits to families made needy by the unemployment of the father. App. to Juris. Statement in No. 78–437, pp. 41A–42A. The court likewise enjoined the Secretary from refusing to provide federal matching funds for payment of such benefits. *Id.*, at 40A–41A.

Although the Commissioner originally had agreed that this was the appropriate remedy, Juris. Statement in No. 78–689, p. 6, he later sought modification of the District Court's order, so as to effect a more limited extension of the AFDC–UF program. The Commissioner requested that he be permitted to pay benefits "only to those families where needy children have been deprived of parental support or care by the unemployment of *the family's principal wage-earner.*" App. to Juris. Statement in No. 78–689, p. 3a (emphasis added).[4] This

[4] The Commissioner proposed to define "principal wage-earner" as the parent whose earned income or unemployment compensation was greater

modification, he argued, would accomplish a gender-neutral extension of the program at a much lower cost. *Id.*, at 4a. On August 9, 1978, the District Court denied the Commissioner's motion, believing that "any reformulation of the statutory scheme . . . which goes beyond the remedy already ordered in this case is properly left to Congressional action." *Id.*, at 13a.

The Secretary, pursuant to 28 U. S. C § 1252, appealed directly to this Court from the District Court's April 20 decision holding § 407 unconstitutional. App. to Juris. Statement in No. 78–437, p. 43A. The Commissioner took a separate appeal, also pursuant to § 1252, from the District Court's August 9 refusal to modify its remedial order. App. to Juris. Statement in No. 78–689, p. 15a. We noted probable jurisdiction and consolidated the cases for argument. 439 U. S. 1044 (1978).

## II

### THE SECRETARY'S APPEAL

The Secretary advances two arguments in support of the constitutionality of § 407. First, he contends that although § 407 incorporates a gender distinction, it does not discriminate against women as a class. Second, he urges that the distinction is substantially related to the achievement of an important governmental objective: the need to deter real or pretended desertion by the father in order to make his family eligible for AFDC benefits.

### A

The Secretary readily concedes that § 407 entails a gender distinction. Brief for Appellant in No. 78–437, p. 36. He submits, however, that the Act does not award AFDC benefits to a father where it denies them to a mother. Rather, the grant or denial of aid based on the father's unemployment

---

during the six months preceding the month of application. App. to Juris. Statement in No. 78–689, pp. 7a–8a.

necessarily affects, to an equal degree, one man, one woman, and one or more children. As the Secretary puts it, even if the statute is "gender-based," it is not "gender-biased." *Ibid.*

We are not persuaded by this analysis. For mothers who are the primary providers for their families, and who are unemployed, § 407 is obviously gender biased, for it deprives them and their families of benefits solely on the basis of their sex. The Secretary's argument, at bottom, turns on the fact that the impact of the gender qualification is felt by family units rather than individuals. But this Court has not hesitated to strike down gender classifications that result in benefits being granted or denied to family units on the basis of the sex of the qualifying parent. See *Frontiero* v. *Richardson,* 411 U. S. 677 (1973) (military quarters allowances and medical and dental benefits); *Weinberger* v. *Wiesenfeld,* 420 U. S. 636 (1975) (survivor's benefits); *Califano* v. *Goldfarb,* 430 U. S. 199 (1977) (survivor's benefits); *Califano* v. *Jablon,* 430 U. S. 924 (1977), summarily aff'g 399 F. Supp. 118 (Md. 1975) (spousal benefits). Here, as in those cases, the statute "discriminates against one particular category of family—that in which the female spouse is a wage earner." *Goldfarb,* 430 U. S., at 209 (plurality opinion).

The Secretary appears to acknowledge the force of these precedents, but suggests that each involved benefits that either were a form of compensation earned by a woman as a member of the labor force, or were directly related to such compensation. In the present case, in contrast, the benefits are part of a noncontributory welfare program. Thus, the Secretary argues, the gender qualification of § 407 is distinguishable from those contained in the earlier cases, for it does not denigrate "the efforts of women who do work and whose earnings contribute significantly to their families' support." *Wiesenfeld,* 420 U. S., at 645.

The distinction between employment-related benefits and other forms of government largesse may be relevant to equal

protection analysis, for example in determining whether the differential treatment of survivor's benefits denigrates the efforts of the deceased spouse. *Wiesenfeld,* 420 U. S., at 645–647; *Goldfarb,* 430 U. S., at 206–207 (plurality opinion). This does not mean, however, that the Constitution is indifferent to a statute that conditions the availability of noncontributory welfare benefits on the basis of gender. The Secretary's argument to the contrary in effect invites a return to the discredited view that welfare benefits are a "privilege" not subject to the guarantee of equal protection. See *Graham* v. *Richardson,* 403 U. S. 365, 374 (1971). Putting labels aside, the exclusion here is if anything more pernicious than those in *Frontiero, Wiesenfeld,* and *Goldfarb.* AFDC–UF benefits are not "fringe benefits," nor are they a type of social assistance paid without regard to need. Rather, they are subsistence payments made available as a last resort to families that would otherwise lack basic necessities. The deprivation imposed by § 407, moreover, is not a mere procedural barrier, like the proof-of-dependency requirement in *Frontiero* and *Goldfarb,* but is an absolute bar to qualification for aid. We therefore reject the contention that the classification imposed by § 407 does not discriminate on the basis of gender.

## B

The Secretary next argues that the gender distinction imposed by § 407 survives constitutional scrutiny because it is substantially related to achievement of an important governmental objective. *Orr* v. *Orr,* 440 U. S. 268, 279 (1979); *Califano* v. *Webster,* 430 U. S. 313, 316–317 (1977); *Craig* v. *Boren,* 429 U. S. 190, 197 (1976). The Secretary identifies two important objectives served by § 407.

First and most obviously, the statute was intended to provide aid for children deprived of basic sustenance because of a parent's unemployment. H. R. Rep. No. 28, 87th Cong., 1st Sess., 2 (1961). As then HEW Secretary Ribicoff put it in

testimony before the House Ways and Means Committee, "there is no justification whatsoever for denying to the child of the unemployed parent the food that you give to the child of the parent who deserts or is absent or dead." Hearings on H. R. 3864 and 3865 before the House Committee on Ways and Means, 87th Cong., 1st Sess., 102 (1961). The appellant Secretary does not contend, however, that the gender qualification of § 407 serves to achieve this goal. Tr. of Oral Arg. 6, 7–8. Nor could he, since families where the mother is the principal wage earner and is unemployed are often in as much need of AFDC–UF benefits and Medicaid as families where the father is unemployed.

Second, the statute was designed to remedy a structural fault in the original AFDC program. Under that program, a family was eligible for benefits if deprived of parental support because of the "continued absence from the home . . . of a parent." 42 U. S. C. § 606 (a). In times of economic adversity, this provision was thought to create an incentive for the father to desert, or to pretend to desert, in order to make the family eligible for assistance. Section 407, by providing AFDC benefits to families rendered needy by parental unemployment, was intended to reduce this incentive and thereby promote the goal of family stability. The Secretary submits that reducing the incentive for the father to desert was an important objective of the AFDC–UF program, and he argues that the gender qualification is substantially related to its achievement.

We perceive, however, at least two flaws in this argument. Although it is relatively clear that Congress was concerned about the problem of parental desertion, see S. Rep. No. 744, 90th Cong., 1st Sess., 160 (1967); H. R. Rep. No. 28, 87th Cong., 1st Sess., 2 (1961), there is no evidence that the gender distinction was designed to address this problem. See *Weinberger* v. *Wiesenfeld,* 420 U. S., at 648. Both the original AFDC program, and the temporary versions of the AFDC–UF

program enacted in 1961 and 1962, were gender neutral. The gender qualification added to the permanent version of AFDC–UF in 1968 escaped virtually unnoticed in the hearings and floor debates.[5] The only explanation for this addition is contained in the following passage, which appears in nearly identical form in both the House and Senate Reports:

> "This program was originally conceived by Congress as one to provide aid for the children of unemployed fathers. However, some States make families in which the father is working but the mother is unemployed eligible for assistance. The bill would not allow such situations. Under the bill, the program could apply only to the children of unemployed fathers." S. Rep. No. 744, at 160.

See also H. R. Rep. No. 554, 90th Cong., 1st Sess., 108 (1967).

This suggests that the gender qualification was part of the general objective of the 1968 amendments to tighten standards for eligibility and reduce program costs.[6] Congress was concerned that certain States were making AFDC–UF assistance available to families where the mother was out of work, but the father remained fully employed and able to support

---

[5] During the Senate floor debate on the Conference Report, Senator Muskie briefly noted and opposed the gender limitation of § 407. 113 Cong. Rec. 36914 (1967).

[6] The overriding purpose of the 1968 AFDC amendments was "[t]o give greater emphasis to getting appropriate members of families drawing aid to families with dependent children (AFDC) payments into employment and thus no longer dependent on the welfare rolls." H. R. Rep. No. 544, 90th Cong., 1st Sess., 3 (1967). The principal changes in the AFDC–UF program designed to accomplish this end included provisions "to authorize a Federal definition of unemployment by the Secretary (but within certain limits set forth in the legislation), to tie the program more closely to the work and training program authorized by the bill, and to protect only the children of unemployed fathers who have had a recent attachment to the work force." *Id.*, at 108.

the family. Apparently, Congress was not similarly concerned about States making benefits available where the father was out of work, but the mother remained fully employed. From all that appears, Congress, with an image of the "traditional family" in mind, simply assumed that the father would be the family breadwinner, and that the mother's employment role, if any, would be secondary. In short, the available evidence indicates that the gender distinction was inserted to reduce costs and eliminate what was perceived to be a type of superfluous eligibility for AFDC–UF benefits. There is little to suggest that the gender qualification had anything to do with reducing the father's incentive to desert.[7]

Even if the actual purpose of the gender qualification was to deal with the problem of paternal desertion, it does not appear that the classification is substantially related to the achievement of that goal. The Secretary argues there is "[s]olid statistical evidence" that fathers are more susceptible to pressure to desert than mothers, and thus that Congress was justified in excluding families headed by unemployed mothers from the AFDC–UF program. Brief for Appellant in No. 78–437, p. 33. We may assume, for purposes of discussion, that Congress could legitimately view paternal desertion as a problem separate and distinct from maternal desertion. Even so, the gender qualification of § 407 is not substantially related to the stated purpose. There is no evidence, in the legislative history or elsewhere, that a father has less incentive to desert in a family where the mother is the breadwinner and becomes unemployed, than in a family where the father is the breadwinner and becomes unemployed. In either case, the family's need will be equally great, and the father will be equally subject to pressure to leave the home to make the

---

[7] This conclusion is reinforced by the fact that both the House and Senate Reports included material dealing specifically with the problem of parental desertion, yet none of this material mentioned the gender qualification of § 407. H. R. Rep. No. 544, 90th Cong., 1st Sess., 102–103 (1967); S. Rep. No. 744, 90th Cong., 1st Sess., 160–163 (1967).

family eligible for benefits. The Secretary urges that Congress could take "one firm step" toward the goal of eliminating the incentive to desert, quoting *Califano* v. *Jobst,* 434 U. S. 47, 57–58 (1977). But Congress may not legislate "one step at a time" when that step is drawn along the line of gender, and the consequence is to exclude one group of families altogether from badly needed subsistence benefits. Cf. *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 489 (1955).

We conclude that the gender classification of § 407 is not substantially related to the attainment of any important and valid statutory goals. It is, rather, part of the "baggage of sexual stereotypes," *Orr* v. *Orr,* 440 U. S., at 283, that presumes the father has the "primary responsibility to provide a home and its essentials," *Stanton* v. *Stanton,* 421 U. S. 7, 10 (1975), while the mother is the " 'center of home and family life.' " *Taylor* v. *Louisiana,* 419 U. S. 522, 534 n. 15 (1975). Legislation that rests on such presumptions, without more, cannot survive scrutiny under the Due Process Clause of the Fifth Amendment.

## III

## THE COMMISSIONER'S APPEAL

### A

"Where a statute is defective because of underinclusion," Mr. Justice Harlan noted, "there exist two remedial alternatives: a court may either declare [the statute] a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by the exclusion." *Welsh* v. *United States,* 398 U. S. 333, 361 (1970) (concurring in result). In previous cases involving equal protection challenges to underinclusive federal benefits statutes, this Court has suggested that extension, rather than nullification, is the proper course. See, *e. g., Jimenez* v. *Weinberger,* 417 U. S. 628, 637–638 (1974); *Frontiero* v. *Richardson,* 411 U. S., at 691 and n. 25 (plurality opinion). Indeed,

this Court regularly has affirmed District Court judgments ordering that welfare benefits be paid to members of an unconstitutionally excluded class. *E. g.*, *Califano* v. *Goldfarb*, 430 U. S. 199 (1977), aff'g 396 F. Supp. 308, 309 (EDNY 1975); *Califano* v. *Silbowitz*, 430 U. S. 924 (1977), summarily aff'g 397 F. Supp. 862, 871 (SD Fla. 1975); *Jablon* v. *Califano*, 430 U. S. 924 (1977), summarily aff'g 399 F. Supp. 118, 132–133 (Md. 1975); *Weinberger* v. *Wiesenfeld*, 420 U. S. 636 (1975), aff'g 367 F. Supp. 981, 991 (NJ 1973); *United States Dept. of Agriculture* v. *Moreno*, 413 U. S. 528 (1973), aff'g 345 F. Supp. 310, 315–316 (DC 1972); *Richardson* v. *Griffin*, 409 U. S. 1069 (1972), summarily aff'g 346 F. Supp. 1226, 1237 (Md.).

The District Court ordered extension rather than invalidation by way of remedy here, and equitable considerations surely support its choice. Approximately 300,000 needy children currently receive AFDC–UF benefits, see 42 Soc. Sec. Bull. 78 (Jan. 1979), and an injunction suspending the program's operation would impose hardship on beneficiaries whom Congress plainly meant to protect. The presence in the Social Security Act of a strong severability clause, 42 U. S. C. § 1303,[8] likewise counsels against nullification, for it evidences a congressional intent to minimize the burdens imposed by a declaration of unconstitutionality upon innocent recipients of government largesse.

There is no need, however, to elaborate here the conditions under which invalidation rather than extension of an under-inclusive federal benefits statute should be ordered, for no party has presented that issue for review. All parties before the District Court agreed that extension was the appropriate remedy. Juris. Statement in No. 78–689, p. 6; Motion to Affirm 5; Juris. Statement in No. 78–437, p. 6 n. 5. Appellees

---

[8] "If any provision of this chapter, or the application thereof to any person or circumstance, is held invalid, the remainder of the chapter, and the application of such provision to other persons or circumstances shall not be affected thereby." 42 U. S. C. § 1303.

support that remedy here, and the Secretary, while arguing in favor of § 407's constitutionality, urges that, if the statute is invalidated, the District Court's remedy should be affirmed. Brief for Federal Appellee in No. 78–689, pp. 5–10. The Commissioner likewise argues that extension, rather than nullification, is proper, Tr. of Oral Arg. 18; indeed, the Commissioner did not appeal from the District Court's April 20 extension order, but only from its August 9 refusal to limit extension along "principal wage-earner" lines. App. to Juris. Statement in No. 78–689, p. 15a. Since no party has presented the issue of extension versus nullification for review, we would be inclined to consider it only if the power to order extension were clearly beyond the constitutional competence of a federal district court. This Court's previous decisions, however, which routinely have affirmed District Court judgments ordering extension of federal welfare programs, suggest strongly that no such remedial incapacity exists.

## B

The narrower question presented by the Commissioner's appeal concerns not the merits of extension versus nullification, but rather the form that extension should take. The District Court ordered that benefits be paid to families in which either the mother or the father is unemployed within the meaning of the Act. The Commissioner agrees that either the mother's or the father's unemployment should be able to qualify a needy family for benefits, but proposes to award them only if the parent in question can show that he or she is *both* unemployed *and* the family's "principal wage-earner." Citing the legislative history of the AFDC–UF program, the Commissioner argues that his proposed remedy comports with Congress' intent to aid families made needy by their *breadwinner's* unemployment. This argument, as the preceding portions of this opinion show, is not without force. We may assume *arguendo* that, if Congress knew in 1968 what it knows now, it might well have adopted the "principal wage-earner"

model suggested by the Commissioner. But this does not mean that the AFDC–UF program should be restructured along these lines by a federal court.

First, the Commissioner's proposed remedy would have the effect of *terminating* benefits to many families currently receiving them. Under the Act and implementing regulations, benefits are paid to needy families of all unemployed fathers, whether or not the father is actually the "principal wage-earner." See 42 U. S. C. § 607 (a); 45 CFR § 233.100 (a)(1) (1978). No one contends that the Act and regulations, insofar as they provide benefits to families of *all* unemployed fathers, are invalid. Absent some such showing of invalidity, we would hesitate to terminate needy families' entitlement to statutory benefits merely because the unemployed father cannot prove "breadwinner" status.

Second, the Commissioner's proposed remedy would involve a restructuring of the Act that a court should not undertake lightly. Whenever a court extends a benefits program to redress unconstitutional underinclusiveness, it risks infringing legislative prerogatives. The extension ordered by the District Court possesses at least the virtue of simplicity: by ordering that "father" be replaced by its gender-neutral equivalent, the court avoided disruption of the AFDC–UF program, for benefits simply will be paid to families with an unemployed parent on the same terms that benefits have long been paid to families with an unemployed father. The "principal wage-earner" solution, by contrast, would introduce a term novel in the AFDC scheme,[9] and would pose definitional and policy questions best suited to legislative or administrative elaboration. The Commissioner, with his "principal wage-earner" gloss on parental unemployment, in essence asks this Court to redefine "unemployment" within the meaning of the

---

[9] The Act, for example, provides benefits to two-parent families made needy by the incapacity of either parent, regardless of which parent may have been the "principal wage-earner." 42 U. S. C. § 606 (a).

Act. Yet "Congress in § 407 (a) expressly *delegated* to the Secretary the power to prescribe standards for determining what constitutes 'unemployment' for purposes of AFDC–UF eligibility. In a situation of this kind, Congress entrusts to the Secretary, rather than to the courts, the primary responsibility for interpreting the statutory term." *Batterton* v. *Francis*, 432 U. S., at 425 (emphasis in original).

The remedy the Commissioner proposes, of course, undeniably would be cheaper than the remedy the District Court decreed, in part because it would terminate some current recipients' eligibility. Although cost may prove a dispositive factor in other contexts, we do not regard it as controlling here. The United States, which will bear the main burden of added coverage through federal matching grants, urges that the District Court's remedy be affirmed. The AFDC–UF program, furthermore, is optional with the States, *id.,* at 431, and any State is free to drop out of it if dissatisfied with the added expense. This Court, in any event, is ill-equipped both to estimate the relative costs of various types of coverage, and to gauge the effect that different levels of expenditures would have upon the alleviation of human suffering. Under these circumstances, any fine-tuning of AFDC coverage along "principal wage-earner" lines is properly left to the democratic branches of the Government. In sum, we believe the District Court, in an effort to render the AFDC–UF program gender neutral, adopted the simplest and most equitable extension possible.

The judgment of the District Court accordingly is affirmed.

*It is so ordered.*

MR. JUSTICE POWELL, with whom THE CHIEF JUSTICE, MR. JUSTICE STEWART, and MR. JUSTICE REHNQUIST join, concurring in part and dissenting in part.

I agree with the Court that § 407 violates the equal protection component of the Fifth Amendment. In my view, how-

ever, the court below erred when it ordered the extension of benefits to all families in which a mother has become unemployed. This extension reinstates a system of distributing benefits that Congress rejected when it amended § 407 in 1968. Rather than frustrate the clear intent of Congress, the court simply should have enjoined any further payment of benefits under the provision found to be unconstitutional.

As Mr. Justice Harlan observed:

> "Where a statute is defective because of underinclusion there exist two remedial alternatives: a court may either declare it a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion." *Welsh* v. *United States,* 398 U. S. 333, 361 (1970) (concurring in result).

In choosing between these alternatives, a court should attempt to accommodate as fully as possible the policies and judgments expressed in the statutory scheme as a whole. See *id.,* at 365–366, and n. 18. It should not use its remedial powers to circumvent the intent of the legislature.

The Court correctly observes that "the gender qualification [of § 407] was part of the general objective of the 1968 amendments to tighten standards for eligibility and reduce program costs." *Ante,* at 87. It is clear that Congress intended to proscribe the payment of benefits to families where only one parent was unemployed and where the principal wage earner continued to work.

> "From all that appears, Congress, with an image of the 'traditional family' in mind, simply assumed that the father would be the family breadwinner, and that the mother's employment role, if any, would be secondary." *Ante,* at 88.

Yet the result of the Court's decision affirming the District

Court's relief is to compel exactly the extension of benefits Congress wished to prevent.[1]

Rather than thus rewriting § 407, we should leave this task to Congress. Now that we have held that this statute constitutes impermissible gender-based discrimination, it is the duty and function of the Legislative Branch to review its AFDC-UF program in light of our decision and make such changes therein as it deems appropriate. Leaving the resolution to Congress is especially desirable in cases such as this one, where the allocation and distribution of welfare funds are peculiarly within the province of the Legislative Branch. See *Califano* v. *Jobst,* 434 U. S. 47 (1977); *Maher* v. *Roe,* 432 U. S. 464, 479 (1977); *Dandridge* v. *Williams,* 397 U. S. 471 (1970).

We cannot predict what Congress will think to be in the best interest of its total welfare program. The extension of AFDC benefits to families suffering only from unemployment was a relatively recent development in the history of the program, a development that Congress made permanent only on the understanding that payments could be limited to cases where the principal wage earner was out of work. We cannot assume that Congress in 1968 would have approved this exten-

---

[1] The relief that perhaps would best approximate what Congress appears to have intended would limit payment of benefits to those families in which the principal wage earner, regardless of gender, has become unemployed. But this approach presents several difficulties, as the Court demonstrates. *Ante,* at 91–93. Under these circumstances, the modification of the order sought by appellant in No. 78–689 properly was rejected.

The Court suggests that payments to families where a breadwinner remains employed are not inconsistent with the Act, because in cases where a parent becomes incapacitated, benefits are paid regardless of the other parent's employment status or history. 42 U. S. C. § 606 (a); see *ante,* at 92 n. 9. This overlooks the special circumstances involved when a parent suffers from an incapacity. In such cases, the family usually must bear not only the costs of income lost through the one parent's unemployment, but also medical and other expenses resulting from the disability that often are quite substantial.

sion if it had known that ultimately payments would be made whenever either parent became unemployed. Nor can we assume that Congress now would adopt such a system in light of the Court's ruling that § 407 is invalid.

The Court emphasizes the hardships that may be caused by enjoining the program until Congress can act. There is the possibility, not mentioned by the Court, that other hardships might be occasioned in the allocating of limited funds as a result of court-ordered extension of these particular benefits. In any event, Congress has the option to mitigate hardships by providing promptly for retroactive payments. An injunction prohibiting further payments at least will conserve the funds appropriated until Congress determines which group, if any, it does want to assist. The relief ordered by the Court today, in contrast, ensures the irretrievable payment of funds to a class of recipients Congress did not wish to benefit.[2]

Because it is clear that Congress intended to prevent the result mandated today, and that the re-examination of § 407 required under our decision properly should be made by Congress, I dissent.

---

[2] The fact that none of the parties here has sought this step, a point which the Court emphasizes, is irrelevant. This issue should turn on the intent of Congress, not the interests of the parties. A court no less is "infringing legislative prerogatives," *ante*, at 92, when it acts at the behest of the particular litigants before it, than when it chooses a remedy on its own initiative.