For The Northern Mariana Islands
By_____
       (Deputy Clerk)

APPELLATE DIVISION

| | |
|---|---|
| PABLITO AMOG, et al., | DCA No. 85-9008 |
| Plaintiff-Appellants. | |
| vs. | OPINION |
| RICHARD J. KEATLEY, as Chief of Immigration and Naturalization Office, | |
| Defendant-Appellee. | |

Attorney for Appellants:       REYNALDO O. YANA
                               P. O. Box 52
                               Saipan, CM 96950

Attorney for Appellee:         PATRICIA G. BEATLEY
                               CNMI Assistant Attorney
                                  General
                               5th Floor, Nauru Building
                               Saipan, CM 96950

BEFORE:   Judges LAURETA, DUENAS and REAL*, District Judges

LAURETA, District Judge:

Plaintiff-appellants, Filipino nationals seeking permanent resident status, appeal from a decision of the Trial Court of the Commonwealth of the Northern Mariana Islands entering judgment on the pleadings in favor of the Government of

_____

*Honorable Manuel L. Real, Chief Judge, United States District Court, Central District of California, sitting by designation.

the Commonwealth. We agree with the trial court's ruling and affirm.

The instant case involves the trial court's interpretation of our decision in _Sirilan v. Castro_, DCA No. 83-9009 (D.N.MI.I.(App.Div.) 1984). _Sirilan_ grew out of Public Law (P.L.) 5-11, which was passed by the Northern Mariana Islands Legislature on April 1, 1977. P.L. 5-11 established a "permanent resident" status under the immigration laws. This status was available to persons who were not Trust Territory citizens, were of good moral character, and who had resided in the Northern Mariana Islands for at least five years.

Subsequently, on April 23, 1981, the Legislature of the Commonwealth of the Northern Mariana Islands (CNMI) enacted P.L. 2-17, thereby repealing P.L. 5-11. On that same day, the legislation was approved by the Governor and took immediate effect. P.L. 2-17 included a savings clause at Section 2, which provided:

> (a) The provisions of this Act shall not repeal, amend, deny, abrogate or otherwise affect the rights and status of any person granted permanent residency status pursuant to Public Law No. 5-11 prior to the effective date of this Act.
>
> (b) The provisions of this Act shall not repeal, amend, deny, abrogate or otherwise affect the rights and status of any person who has filed an application for permanent residency status pursuant to Public Law No. 5-11 prior to the effective date of this Act. All persons who have duly filed for permanent residency status prior to such date shall have their applications processed and determined in accordance with the rules, regulations and administrative procedures adopted pursuant to Public Law No. 5-11.

AO 72
(v.8/82)

753

The _Sirilan_ plaintiffs qualified for permanent residency under P.L. 5-11 but had not yet filed their applications with the Immigration and Naturalization Office (INO). When they sought to do so on April 24, 1981, their applications were refused. Suit was brought in the Commonwealth Trial Court challenging the validity of P.L. 2-11 on, _inter alia_, grounds of equal protection. Plaintiffs' arguments were rejected and summary judgment was granted in favor of the Government.

On appeal to this Court, the trial court's decision rejecting the equal protection challenge was reversed. The panel found the eligibility classifications established by P.L. 2-17 unconstitutional and remanded to the trial court with directions to provide non-citizens who met the substantive qualifications for permanent resident status on April 23, 1981, a fair opportunity and reasonable time to complete and file their applications with the INO. _Sirilan_, slip op. at 47.

Here, appellants allege they possess the qualifications required by P.L. 5-11 but concede that they did not meet the requirements as of April 23, 1981, the effective date of P.L. 2-17, the repealer. Their claims rest on the theory that _Sirilan_ necessarily invalidated P.L. 2-17 in its entirety; thereby restoring P.L. 5-11. The trial court rejected this argument, as do we.

Appellants contend the _Sirilan_ panel had but three options: 1) to declare P.L. 2-17 valid, 2) to invalidate only Section 2 of P.L. 2-17, thereby placing into question the rights

754

of those persons possessing permanent resident status, or, 3) to strike down P.L. 2-17 altogether, effectively reviving P.L. 5-11. Appellants surmise that the first option was rejected and the second discarded as undesirable, leaving only the third option. However, appellants misunderstand the powers of an appellate tribunal.

The Sirilan panel concluded that the Commonwealth possessed the authority to terminate the permanent residency program and repeal P.L. 5-11. Sirilan, slip op. at 13-14. However, the panel was disturbed by the cut-off line which "significantly burdened members of the [eligible] class in a very arbitrary fashion." Sirilan, slip op. at 44. The record contained evidence that the certification program in the Mayor's office, which program provided necessary certificates of good character, was operated in an arbitrary and inconsistent manner. Id. Also, there was evidence that many applications were delayed because of problems retrieving necessary documents from the native country, the Philippines. Other affidavits alleged "dissemination of misinformation" by government officials, which resulted in the failure to file applications in some cases. Id. In light of these factors, and in the absence of proof by the Government that sufficiently important government interests outweighed the arbitrariness caused by the classification chosen, the panel concluded that the line did not provide "a sufficiently close fit" to survive constitutional review. Sirilan, slip op. at 45. In other words, while the termination of the program as

of April 23, 1981, was valid, the classification chosen to effect the cut-off was not. It was underinclusive.

The power of an appellate court in a situation such as was presented in Sirilan is well stated by Justice Harlan in his concurrence in Welsh v. United States, 398 U.S. 333, 90 S.Ct. at 1792, 26 L.Ed.2d 308 (1970):

> Where a statute is defective because of underinclusion there exist two remedial alternatives: a court may either declare it a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by exclusion.

90 S.Ct. at 1808. See also Soto-Lopez v. New York Civil Service Commission, 755 F.2d 266 (2nd Cir. 1985); Moritz v. C.I.R., 469 F.2d 466 (10th Cir. 1972). When faced with a such decision, the Supreme Court has held that "extension, rather than nullification, is the proper course." Califano v. Westcott, 443 U.S. 76, 89, 99 S.Ct. 2655, 2663 61 L.Ed.2d 382 (1979). Ultimately determinative is the legislative intent; the court must decide "whether it more nearly accords with [the legislature's] wishes to eliminate its policy altogether or extend it in order to render what [the legislature] plainly did intend, constitutional." Welsh, 90 S.Ct. at 1804 (Harlan, J., concurring in the judgment). In ascertaining the legislative intent, a severability clause has been viewed as persuasive evidence of a legislative desire that the court extend rather than nullify. See, e.g., Welsh, supra, quoting Champlin Rfg. Co. v. Corporation

Commission, 286 U.S. 210, 235, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932)(clause "discloses an intention to make the act divisible, and creates a presumption that, eliminating invalid parts, the legislature would have been satisfied with what remained."); Moritz v. C.I.R., 469 F.2d 466, 470 (10th Cir. 1972)("extending the coverage seems logical and proper, in view of their purpose and the broad separability clause in the act").

█. Here, there can be no serious dispute as to the intention and preference of the Commonwealth Legislature. The Legislature was firm in its desire to repeal P.L. 5-11, finding that such action would "prevent a continued drain of public services and expenses to the Government." H.Rpt. No. 2-75. The Report further found the continuance of the permanent residency program "politically . . . unwise." Id. However, the Legislature intended to protect the rights of those who already had been granted permanent resident status. In an attempt to properly draw a line, the Legislature chose to allow those who had filed applications the benefit of the status. Id. The Government considered the "line so drawn [as] the natural and common sense point of demarkation." Sirilan at 43. On appeal, the panel, agreeing that the line was not irrational, nevertheless concluded that it was underinclusive and chose to enlarge the class of potential permanent residents. In light of the purpose of the Act and in view of these reasons, it is relatively beyond dispute that had the Legislature known that the line they had drawn was unconstitutional, they would rather have a constitutional line

drawn than have the legislation invalidated altogether.

This conclusion is supported by the broad severability clause later enacted as part of P.L. 3-90, the Commonwealth Code Act. Section 16 provides:

Section 16. Severability.

> If any of the provisions of this Code, or the application thereof to any person or circumstance, is held invalid, that invalidity shall not affect any other provision or application of this Code which can be given effect without the invalid provision or application, and to this end the provisions of this Code are severable. [Emphasis added.]

As the trial court notes (decision p.17), this clause was enacted subsequent to P.L. 2-17 but was clearly intended to apply to all Code sections. The clause and its specific reference to "the application" of the laws supports a conclusion that the enlargement of the coverage of P.L. 2-17, as opposed to the invalidation of the law, more accurately accords with the legislative intent.

Of course, of perhaps determinative relevance here is the intent of the appellate court in Sirilan. The panel chose not to invalidate P.L. 2-17 due to its constitutional infirmity; rather, it chose to interpret the legislation in a manner that met with constitutional norms. This was within the court's power and authority.

///

///

///

///

758

The decision of the trial court regarding judgment on the pleadings in favor of the Government is affirmed.

_____
JUDGE ALFRED LAURETA

_____
JUDGE CRISTOBAL C. BUENAS

_____
JUDGE MANUEL L. REAL