# HECKLER, SECRETARY OF HEALTH AND HUMAN SERVICES *v.* MATHEWS ET AL.

No. 82–1050.   Argued December 5, 1983—Decided March 5, 1984

BRENNAN, J., delivered the opinion for a unanimous Court.

*Mark I. Levy* argued the cause for appellant. With him on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath,* and *Deputy Solicitor General Geller.*

*John R. Benn* argued the cause for appellees. With him on the brief were *Robert W. Bunch* and *Bruce K. Miller.**

JUSTICE BRENNAN delivered the opinion of the Court.

*Califano* v. *Goldfarb,* 430 U. S. 199 (1977), held that a gender-based classification in the spousal-benefit provisions of the Social Security Act violated the right to the equal protection of the laws guaranteed by the Due Process Clause

---

*\*Isabelle Katz Pinzler, Burt Neuborne,* and *Nancy Duff Campbell* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

*Edith U. Fierst, Joseph F. Henderson,* and *James R. Rosa* filed a brief for the American Federation of Government Employees et al. as *amici curiae.*

of the Fifth Amendment. In this case, the United States District Court for the Northern District of Alabama held that amendments to the Act, adopted in 1977 partly in response to our decision, unjustifiably revive the gender-based classification that was invalidated in *Goldfarb* and therefore also violate the Fifth Amendment. App. to Juris. Statement 1a–9a. The Secretary of Health and Human Services appealed directly to this Court. We noted probable jurisdiction under 28 U. S. C. § 1252, 460 U. S. 1036 (1983), and now reverse.

# I

## A

The Social Security Act (Act) provides spousal benefits for the wives, husbands, widows, and widowers of retired and disabled wage earners. 42 U. S. C. § 402 (1976 ed. and Supp. V). Prior to December 1977, benefits were payable only to those husbands or widowers who could demonstrate dependency on their wage-earning wives for one-half of their support. Wives and widows, on the other hand, were entitled to spousal benefits without any such showing of dependency on their husbands. See former 42 U. S. C. §§ 402(b), (c)(1)(C), and (f)(1)(D). In March 1977, *Califano* v. *Goldfarb, supra,* affirmed the judgment of a three-judge District Court which held that the gender-based dependency requirement for widowers violated the equal protection component of the Due Process Clause of the Fifth Amendment.[1] Subsequently, the Court summarily affirmed two District Court decisions invalidating the dependency requirement for husbands' benefits. *Califano* v. *Silbowitz,* 430 U. S. 924 (1977); *Jablon* v. *Califano,* 430 U. S. 924 (1977).

Following these decisions, as part of a general reform of the Social Security system, Congress repealed the dependency requirement for widowers and husbands. Social Security

---

[1] There was no majority opinion in *Goldfarb.* See 430 U. S., at 201 (plurality opinion); *id.,* at 217 (STEVENS, J., concurring in judgment).

Amendments of 1977 (1977 Amendments), §§ 334(b)(1), (d)(1), Pub. L. 95–216, 91 Stat. 1544, 1545, 42 U. S. C. §§ 402(c)(1), (f)(1) (1976 ed., Supp. V). See S. Rep. No. 95–572, pp. 88, 93 (1977).[2] It concluded, however, that elimination of the dependency test, by increasing the number of individuals entitled to spousal benefits, could create a serious fiscal problem for the Social Security trust fund. See *id.*, at 27–28. This problem was particularly acute with respect to the large number of retired federal and state employees who would now become eligible for spousal benefits. Unlike most applicants, who must offset any dual Social Security benefits against each other, 42 U. S. C. § 402(k)(3)(A), retired civil servants could, at the time of the 1977 Amendments, receive the full amount of both the spousal benefits and the government pensions to which they were entitled. Congress estimated that payment of unreduced spousal benefits to such individuals could cost the system an estimated $190 million in 1979. S. Rep. No. 95–572, *supra*, at 27–28.

To avoid this fiscal drain, Congress included as part of the 1977 Amendments a "pension offset" provision that generally requires the reduction of spousal benefits by the amount of certain Federal or State Government pensions received by the Social Security applicant. 1977 Amendments, §§ 334 (a)(2) and (b)(2), 42 U. S. C. §§ 402(b)(4)(A) and (c)(2)(A) (1976 ed., Supp. V). Congress estimated that 90 percent of the savings that would be achieved by the pension offset provision as proposed by the Senate would be attributable to a reduction in payments to nondependent husbands and widowers who had not been entitled to any spousal benefits prior to

---

[2] At the same time, Congress directed the Department of Health, Education, and Welfare to include "the entire question of such gender-based distinctions . . . in [a] 6-month study of proposals to eliminate dependency and sex discrimination . . . ." H. R. Conf. Rep. No. 95–837, p. 73 (1977). Thereafter, other gender-based distinctions were eliminated from the Act by the Social Security Amendments of 1983, Pub. L. 98–21, §§ 301–309, 97 Stat. 109–115; see H. R. Conf. Rep. No. 98–47, p. 140 (1983).

the decision in *Goldfarb.* See S. Rep. No. 95–572, *supra*, at 81. The remaining portion of the savings, however, would come from a reduction in benefits to individuals, mostly women but also dependent men, who had retired or were about to retire and who had planned their retirements in reliance on their entitlement, under pre-1977 law, to spousal benefits unreduced by government pension benefits. See *ibid.;* H. R. Conf. Rep. No. 95–837, p. 72 (1977); S. Conf. Rep. No. 95–612, p. 72 (1977). In order to protect the reliance interests of this group, see *infra*, at 742, Congress exempted from the pension offset requirement as ultimately enacted those spouses who were eligible to receive pension benefits prior to December 1982 and who would have qualified for unreduced spousal benefits under the Act "as it was in effect and being administered in January 1977." 1977 Amendments, § 334(g)(1), note following 42 U. S. C. § 402 (1976 ed., Supp. V).[3]

---

[3] Section 334(g) of the 1977 Amendments, Pub. L. 95–216, 91 Stat. 1546, note following 42 U. S. C. § 402 (1976 ed., Supp. V), provides in full:

"(1) The amendments made by the preceding provisions of this section [section 334] shall not apply with respect to any monthly insurance benefit payable, under subsection (b), (c), (e), (f), or (g) (as the case may be) of section 202 of the Social Security Act, to an individual —

"(A) to whom there is payable for any month within the 60-month period beginning with the month in which this Act is enacted (or who is eligible in any such month for) a monthly periodic benefit (within the meaning of such provisions) based upon such individual's earnings while in the service of the Federal Government or any State or political subdivision thereof, as defined in section 218(b)(2) of the Social Security Act); and

"(B) who at time of application for or initial entitlement to such monthly insurance benefit under such subsection (b), (c), (e), (f), or (g) meets the requirements of that subsection as it was in effect and being administered in January 1977.

"(2) For purposes of paragraph (1)(A), an individual is eligible for monthly periodic benefit for any month if such benefit would be payable to such individual for that month if such individual were not employed during that month and had made proper application for such benefit.

"(3) If any provision of this subsection, or the application thereof to any person or circumstance, is held invalid, the remainder of this section shall

In the same subsection in which it established this 5-year grace period for individuals who qualified for spousal benefits in January 1977, Congress also included a severability clause, which provides:

> "If any provision of this subsection, or the application thereof to any person or circumstance, is held invalid, the remainder of this section shall not be affected thereby, but the application of this subsection to any other persons or circumstances shall also be considered invalid." 1977 Amendments, § 334(g)(3), note following 42 U. S. C. § 402 (1976 ed., Supp. V).

The Conference Committee explained that the severability clause was enacted "so that if [the exception to the pension offset provision] is found invalid the pension-offset . . . would not be affected, and the application of the exception clause would not be broadened to include persons or circumstances that are not included within it." H. R. Conf. Rep. No. 95–837, pp. 71–72 (1977); S. Conf. Rep. No. 95–612, pp. 71–72 (1977).

## B

Appellee Robert H. Mathews (hereafter Mathews or appellee) retired from his job with the United States Postal Service on November 18, 1977. His wife, who had retired from her job a few months earlier, was fully insured under the

---

not be affected thereby, but the application of this subsection to any other persons or circumstances shall also be considered invalid."

On January 12, 1983, Congress created an exception from the pension offset provision for any person eligible for a pension prior to July 1983 who satisfies a half-support dependency test. Pub. L. 97–455, § 7, 96 Stat. 2501. On April 20, 1983, Congress revised the pension offset provision, which is now applicable to all persons, without exception, who become eligible to retire in or after July 1983 and which requires the offsetting of only two-thirds of the public pension. Pub. L. 98–21, § 337, 97 Stat. 131. The exception to the offset provision at issue in this case still applies to nondependent women eligible for pensions prior to December 1982 but not to such nondependent men as the named plaintiff in this action. Accordingly, the recent amendments to the Act do not moot this case.

Social Security Act. In December 1977, Mathews applied for husband's benefits on his wife's account. On review of the application, the Social Security Administration (SSA) informed Mathews that he was entitled to spousal benefits of $153.30 per month but that, because, as appellee acknowledged, he was not dependent upon his wife for one-half of his support, this amount would be entirely offset by his $573 per month Postal Service pension in accordance with § 334(b)(2) of the 1977 Amendments, 42 U. S. C. § 402(c)(2) (1976 ed., Supp. V). App. to Juris. Statement 2a. After a hearing, an Administrative Law Judge (ALJ) affirmed the SSA's initial decision. *Id.*, at 16a–22a. The ALJ's decision was in turn affirmed by the Appeals Council of the Department of Health and Human Services and thereby became the final decision of the Secretary. *Id.*, at 13a–14a.

Mathews and his wife then brought this class action against the Secretary in the United States District Court for the Northern District of Alabama under § 205(g) of the Act, 42 U. S. C. 405(g). The complaint alleged that application of the pension offset provision of the 1977 Amendments to Mathews and other nondependent men but not to similarly situated nondependent women violated the Due Process Clause of the Fifth Amendment and sought a declaratory judgment to that effect. Appellee also contended that the severability clause of the 1977 Amendments was unconstitutional. The District Court certified a nationwide class composed of "all applicants for husband's insurance benefits . . . whose applications . . . have been denied [beginning 60 days before the filing of the complaint] solely because of the statutory requirement that husbands must have received more than one-half of their support from their wives in order to be entitled to benefits." App. to Juris. Statement 10a.

Shortly thereafter, the District Court filed an opinion, *id.*, at 1a–9a, and order, *id.*, at 27a–28a, holding both the pension offset exception of § 334(g)(1)(B) and the severability clause of § 334(g)(3) unconstitutional. The court noted that, in es-

sence, the exception to the pension offset "provides a five-year grace period for all women who retire within five years of the enactment, and for men who retire within five years of the enactment and who are economically dependent upon their wives." *Id.*, at 3a. In light of this gender-based classification, the court noted that the offset exception could be upheld only if it "'serve[s] important governmental objectives and [is] substantially related to achievement of those objectives.'" *Id.*, at 4a, quoting *Craig v. Boren*, 429 U. S. 190, 197 (1976). The court decided that the exception could not be justified as protecting the reliance interests of individuals who had planned their retirements prior to the 1977 Amendments in expectation of undiminished benefits because, by requiring men to prove dependency notwithstanding the decision in *Goldfarb*, the offset exception presumes that "women would have relied upon the practices of the Social Security Administration, yet men would not have relied upon a decision of the Supreme Court." App. to Juris. Statement 5a. Accordingly, the court held that the "portion of the exception to the pension offset provision that requires a male applicant to prove that he received one-half of his economic support from his wife violates the equal protection guarantees of the due process clause of the fifth amendment." *Id.*, at 6a–7a (footnote omitted).

Having invalidated the exception to the offset provision, the District Court considered the severability clause of § 334(g)(3). The court noted that, in the event appellee obtained a judgment that the offset exception unconstitutionally discriminates against him, the clause, if valid, would require nullification of the exception as to all persons, rather than extension of the exception to persons like appellee. Consequently, all government retirees not covered by Social Security, without regard to gender or dependency, would have their spousal benefits offset by the amount of their government pensions. The court characterized this effect of the severability clause as an effort by Congress "to mandate the

outcome of any challenge to the validity of the [pension off-set] exception by making such a challenge fruitless. Even if a plaintiff achieved success in having the gender-based classification stricken, he would derive no personal benefit from the decision, because the pension offset would be applied to all applicants without exception." *Id.*, at 8a. Because of its view that Congress could not have meant to defeat the reliance interests of government retirees in that way, the court concluded "that the severability clause is not an expression of the true Congressional intent, but instead is an adroit attempt to discourage the bringing of an action by destroying standing." *Ibid.* Accordingly, the court held the severability provision unconstitutional and ordered the Secretary to pay Mathews and the rest of the plaintiff class full spousal benefits without regard to dependency and without offsetting the amount of their government pensions. *Id.*, at 9a.

## II

Because it may affect our jurisdiction, see *Linda R. S.* v. *Richard D.*, 410 U. S. 614, 616 (1973), we consider first the District Court's conclusion that the severability provision of the 1977 Amendments would, if valid, deprive appellee of standing to bring this action by preventing him from receiving any more spousal benefits if he prevails than he is now allowed. Appellee agrees with the District Court's analysis and, for that reason, contends that the severability clause amounts to an unconstitutional attempt by Congress to thwart the jurisdiction and remedial power of the federal courts. We agree with the Secretary, however, that because the right asserted by appellee is the right to receive "benefits . . . distributed according to classifications which do not without sufficient justification differentiate among covered [applicants] solely on the basis of sex," *Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 647 (1975), and not a substantive right to any particular amount of benefits, appellee's standing does not depend on his ability to obtain increased Social Security payments.

In order to establish standing for purposes of the constitutional "case or controversy" requirement, a plaintiff "must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S. 91, 99 (1979), and that the injury "is likely to be redressed by a favorable decision," *Simon* v. *Eastern Kentucky Welfare Rights Organization*, 426 U. S. 26, 38 (1976). In this case, appellee claims a type of personal injury we have long recognized as judicially cognizable.[4] He alleges that the pension offset exception subjects him to unequal treatment in the provision of his Social Security benefits solely because of his gender; specifically, as a nondependent man, he receives fewer benefits than he would if he were a similarly situated woman. App. 6.

Although the severability clause would prevent a court from redressing this inequality by increasing the benefits payable to appellee, we have never suggested that the injuries caused by a constitutionally underinclusive scheme can be remedied only by extending the program's benefits to the excluded class. To the contrary, we have noted that a court sustaining such a claim faces "two remedial alternatives: [it] may either declare [the statute] a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by the exclusion." *Welsh* v. *United States*, 398 U. S. 333, 361 (1970) (Harlan, J., concurring in result). See *Califano* v. *Westcott*, 443 U. S. 76,

---

[4] *E. g.*, *Wengler* v. *Druggists Mutual Insurance Co.*, 446 U. S. 142, 147–149 (1980); *Califano* v. *Goldfarb*, 430 U. S. 199, 212 (1977) (plurality opinion). See *Baker* v. *Carr*, 369 U. S. 186, 207 (1962) (finding standing in case in which "[t]he injury which appellants assert is that this classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality *vis-à-vis* voters in irrationally favored counties"). See also *Linda R. S.* v. *Richard D.*, 410 U. S. 614, 620–621 (1973) (WHITE, J., dissenting).

89–91 (1979).[5]   For that reason, we have frequently entertained attacks on discriminatory statutes or practices even when the government could deprive a successful plaintiff of any monetary relief by withdrawing the statute's benefits from both the favored and the excluded class.[6]

These decisions demonstrate that, like the right to procedural due process, see *Carey* v. *Piphus*, 435 U. S. 247, 266 (1978), the right to equal treatment guaranteed by the Constitution is not coextensive with any substantive rights to the benefits denied the party discriminated against.   Rather, as we have repeatedly emphasized, discrimination itself, by perpetuating "archaic and stereotypic notions" or by stigmatizing members of the disfavored group as "innately inferior" and therefore as less worthy participants in the political community, *Mississippi University for Women* v. *Hogan*, 458 U. S. 718, 725 (1982), can cause serious noneconomic injuries

---

[5] Although the choice between "extension" and "nullification" is within the "constitutional competence of a federal district court," *Califano* v. *Westcott*, 443 U. S., at 91, and ordinarily "extension, rather than nullification, is the proper course," *id.*, at 89, the court should not, of course, "use its remedial powers to circumvent the intent of the legislature," *id.*, at 94 (opinion of POWELL, J.), and should therefore "measure the intensity of commitment to the residual policy and consider the degree of potential disruption of the statutory scheme that would occur by extension as opposed to abrogation." *Welsh* v. *United States*, 398 U. S., at 365 (Harlan, J., concurring in result).   See also *Califano* v. *Westcott, supra,* at 90.   In this case, Congress has, through the severability clause, clearly expressed its preference for nullification, rather than extension, of the pension offset exception in the event it is found invalid.   Because we conclude that the severability clause does not deprive appellee of standing to seek judicial redress for the alleged discrimination of the offset exception, we need not consider his claim that a legislative attempt to thwart a court's ability to remedy a constitutional violation would itself violate the Constitution. See Brief for Appellees 40–55.

[6] *E. g., Wengler* v. *Druggists Mutual Insurance Co., supra,* at 152–153; *Orr* v. *Orr,* 440 U. S. 268, 272 (1979); *Califano* v. *Webster,* 430 U. S. 313, 316 (1977); *Kahn* v. *Shevin,* 416 U. S. 351, 352 (1974); *Stanton* v. *Stanton,* 421 U. S. 7, 17–18 (1975).

to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.[7] Accordingly, as Justice Brandeis explained, when the "right invoked is that to equal treatment," the appropriate remedy is a *mandate* of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class. *Iowa-Des Moines National Bank* v. *Bennett*, 284 U. S. 239, 247 (1931).[8] Because the severability clause would forbid only the latter and not the former kind of relief in this case, the injury caused by the unequal treatment allegedly suffered by appellee may "be redressed by a favorable decision," *Simon* v. *Eastern Kentucky Welfare Rights Organization, supra,* at 38, and he therefore has standing to prosecute this action.[9]

---

[7] See, *e. g., Bob Jones University* v. *United States*, 461 U. S. 574, 593–595 (1983); *Havens Realty Corp.* v. *Coleman*, 455 U. S. 363, 373–374 (1982); *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S. 91, 109–114 (1979); *Norwood* v. *Harrison*, 413 U. S. 455, 465–466, 467 (1973); *Frontiero* v. *Richardson*, 411 U. S. 677, 684–685 (1973) (plurality opinion); *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205, 208 (1972); *id.*, at 212 (WHITE, J., concurring); *Brown* v. *Board of Education*, 347 U. S. 483, 493 (1954). See also *Sierra Club* v. *Morton*, 405 U. S. 727, 734–735 (1972).

[8] Consistent with Justice Brandeis' explanation of the appropriate relief for a denial of equal treatment, we have often recognized that the victims of a discriminatory government program may be remedied by an end to preferential treatment for others. *E. g., Gilmore* v. *City of Montgomery*, 417 U. S. 556, 566–567 (1974); *Norwood* v. *Harrison, supra,* at 470–471; *Griffin* v. *School Board of Prince Edward County*, 377 U. S. 218, 232–234 (1964). See also *Califano* v. *Westcott, supra,* at 93–94 (opinion of POWELL, J.) (finding federal aid program violative of plaintiffs' right to equal protection but arguing that appropriate remedy under statute was to enjoin further payment of benefits to all applicants, including plaintiffs).

[9] The relationship between the right asserted by appellee and the injury allegedly caused by the denial of that right distinguishes this case from *Simon* v. *Eastern Kentucky Welfare Rights Organization.* In that case, the Court concluded that indigents, who contended that they were denied medical treatment by tax-exempt hospitals, lacked standing to challenge the Government's allegedly unlawful administration of the Tax Code because it was "purely speculative" whether their injury was caused by the

## III

Although appellee prevailed in the District Court on his constitutional claim, he urges as an alternative ground for affirmance that we construe the pension offset exception so that it does not incorporate a gender-based classification of the kind invalidated in *Califano* v. *Goldfarb*, 430 U. S. 199 (1977), but instead exempts from the offset requirement both men and women, without regard to dependency. Relying on "the maxim that statutes should be construed to avoid constitutional questions," *United States* v. *Batchelder*, 442 U. S. 114, 122 (1979), he contends that Congress, in reviving the qualifying criteria in effect before the decision in *Goldfarb*, must be presumed to have done so without reenacting the gender-based dependency test which this Court had held unconstitutional.

The canon favoring constructions of statutes to avoid constitutional questions does not, however, license a court to usurp the policymaking and legislative functions of duly elected representatives. *Yu Cong Eng* v. *Trinidad*, 271 U. S. 500, 518 (1926). See *NLRB* v. *Catholic Bishop of Chicago*, 440 U. S. 490, 499–501 (1979); *id.*, at 508–511 (BRENNAN, J., dissenting); *United States* v. *Sullivan*, 332 U. S. 689, 693 (1948). " '[A]lthough this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of

---

Government's actions or was instead attributable to "decisions made by the hospitals without regard to the tax implications." 426 U. S., at 42–43. Here, in contrast, there can be no doubt about the direct causal relationship between the Government's alleged deprivation of appellee's right to equal protection and the personal injury appellee has suffered—denial of Social Security benefits solely on the basis of his gender. Similarly, because appellee personally has been denied benefits that similarly situated women receive, his is not a generalized "claim of 'the right possessed by every citizen, to require that the Government be administered according to law . . . .' " *Baker* v. *Carr*, 369 U. S., at 208, quoting *Fairchild* v. *Hughes*, 258 U. S. 126, 129 (1922).

perverting the purpose of a statute . . .' or judicially rewriting it." *Aptheker* v. *Secretary of State*, 378 U. S. 500, 515 (1964), quoting *Scales* v. *United States*, 367 U. S. 203, 211 (1961). In this case, the language and history of the offset exception plainly demonstrate that Congress meant to resurrect, for a 5-year grace period, the gender-based dependency test of pre-*Goldfarb* law.

As we have noted, *supra*, at 731–733, Congress adopted the pension offset requirement to prevent the serious fiscal drain that it concluded would result from payment of unreduced benefits to the new class of recipients made eligible by the decision in *Goldfarb*. Nevertheless, in an effort to protect the reliance interests of individuals who had planned their retirement before the March 1977 *Goldfarb* decision and the resulting amendments to the Act, see H. R. Conf. Rep. No. 95–837, p. 72 (1977); S. Conf. Rep. No. 95–612, p. 72 (1977), Congress exempted from the offset requirement those individuals eligible for spousal benefits under the Act "as it was in effect and being administered in January 1977." There can be no dispute that in January 1977 men were eligible for benefits only upon a showing of dependency whereas women were subject to no such requirement. See former 42 U. S. C. §§ 402(c) and (f); *Califano* v. *Goldfarb*, *supra*, at 201–202, and nn. 1, 2.[10] And Congress further indicated its intent to revive those eligibility criteria by including an un-

---

[10] This conclusion, contrary to appellee's suggestion, is not altered by the fact that in January 1977 the SSA was withholding disputed benefit claims pending this Court's disposition of *Goldfarb*. The Social Security Claims Manual in effect at the time notes: "The current law requires that claimants for (widower's) (husband's) benefits meet a one-half support requirement. [While that requirement has been challenged in court], the law remains unchanged and no payment can be made until a final decision has been rendered on the constitutionality of the one-half support requirement." Social Security Administration Claims Manual Transmittal No. 3844 (July 14, 1976). Thus, the Manual indicates that, as provided by the extant provisions of the Act, the SSA did not in January 1977 pay benefits to male claimants who failed to demonstrate dependency on their wives.

usual severability clause that would, in the event the classification were held invalid, sacrifice the exception's protection of reliance interests to the goal served by the offset provision itself—preventing an undue financial burden on the system. See *supra*, at 734, and n. 5; H. R. Conf. Rep. No. 95–837, *supra*, at 72; S. Conf. Rep. No. 95–612, *supra*, at 72.

Consistent with the plain import of these provisions, Senator Long, then Chairman of the Senate Finance Committee and principal manager of the bill in the Senate, explained that the exception clause was meant "to afford . . . protection to those who anticipated receiving their spouses benefits prior to March 1977 *without providing it also to those [who] would qualify only as a result of [the Goldfarb] decision."* 123 Cong. Rec. 39134 (1977) (emphasis added). See also *id.*, at 39008 (remarks of Rep. Ullman). Appellee's proposed interpretation of the exception provision would defeat this clearly expressed intention and, by rendering the offset requirement applicable to very few applicants,[11] frustrate the congres-

---

[11] The only individuals identified by appellee who would be subject to the offset requirement under his interpretation of the Act are those who first became eligible for spousal benefits after enactment of the statute in December 1977. See Brief for Appellees 23–24; Reply Brief for Appellant 4, 5, n. 2. For example, the 1977 Amendments shortened the number of years a divorced wife must be married before being eligible for spousal benefits, effective December 1978, Pub. L. 95–216, § 337, 91 Stat. 1548, 42 U. S. C. §§ 402(b)(1)(G), 416(d) (1976 ed., Supp. V), and a number of judicial decisions just prior and subsequent to the Amendments extended eligibility for benefits to new categories of individuals, see, *e. g., Cooper* v. *Harris,* 87 F. R. D. 107 (ED Pa. 1980) (young husbands); *Mertz* v. *Harris,* 497 F. Supp. 1134 (SD Tex. 1980) (remarried widowers); *Yates* v. *Califano,* 471 F. Supp. 84 (WD Ky. 1979) (surviving divorced fathers); *Oliver* v. *Califano,* [1977–1978 Transfer Binder] CCH Unempl. Ins. Rep. ¶ 15244 (ND Cal. 1977) (divorced husbands). These groups were not, however, mentioned in the legislative history of the offset and exception provisions, and limiting the offset to such newly eligible beneficiaries would frustrate Congress' express desire to prevent the financial burden to the system of extending unreduced benefits to those nondependent men first made eligible by the *Goldfarb* decision. See S. Rep. No. 95–572, pp. 27–28 (1977).

sional aim of preventing a major fiscal drain on the Social Security trust fund. Accordingly, we reject appellee's construction of the Act and conclude that the exception to the offset provision applies to otherwise eligible men only when they can show dependency on their wives for one-half of their support. We turn therefore to consider the constitutionality of that gender-based classification.

## IV

We recently reviewed the "firmly established principles" by which to evaluate a claim of gender discrimination like that made by appellee:

"Our decisions . . . establish that the party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an 'exceedingly persuasive justification' for the classification. . . . The burden is met only by showing at least that the classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.' . . .

"Although the test for determining the validity of a gender-based classification is straightforward, it must be applied free of fixed notions concerning the roles and abilities of males and females. Care must be taken in ascertaining whether the statutory objective itself reflects archaic and stereotypic notions. Thus, if the statutory objective is to exclude or 'protect' members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior, the objective itself is illegitimate. . . .

"If the State's objective is legitimate and important, we next determine whether the requisite direct, substantial relationship between objective and means is present." *Mississippi University for Women* v. *Hogan,* 458 U. S., at 724–725. (Citations and footnotes omitted.)

We therefore consider in turn whether the Secretary has carried her burden of (A) showing a legitimate and "exceedingly persuasive justification" for the gender-based classification of the pension offset provision and (B) demonstrating "the requisite direct, substantial relationship" between the classification and the important governmental objectives it purports to serve.

## A

Although the offset exception temporarily revives the gender-based eligibility requirements invalidated in *Goldfarb*, Congress' purpose in adopting the exception bears no relationship to the concerns that animated the original enactment of those criteria. The Court concluded in *Goldfarb* that the original gender-based standards, which were premised on an assumption that females would normally be dependent on the earnings of their spouses but males would not, constituted an "accidental byproduct of a traditional way of thinking about females," 430 U. S., at 223 (STEVENS, J., concurring in judgment), that reflected "'old notions' and 'archaic and overbroad' generalizations" about the roles and relative abilities of men and women, *id.*, at 211, 217 (plurality opinion). Accordingly, the statute's "objective itself [was] illegitimate." *Mississippi University for Women* v. *Hogan, supra*, at 725.[12]

The provision at issue here, in contrast, reflects no such illegitimate government purposes. As detailed above, Congress adopted the offset exception in order to protect the expectations of persons, both men and women, who had planned their retirements based on pre-January 1977 law, under which they could receive spousal benefits unreduced by the amount of any government pensions to which they were also entitled. Congress accomplished its aim by incor-

---

[12] See also *Wengler* v. *Druggists Mutual Insurance Co.*, 446 U. S., at 147–149; *Weinberger* v. *Wiesenfeld*, 420 U. S. 636, 643 (1975); *Schlesinger* v. *Ballard*, 419 U. S. 498, 507 (1975); *Frontiero* v. *Richardson*, 411 U. S., at 688.

porating the eligibility criteria as they existed in January 1977; its choice of this approach rather than an explicit adoption of new gender-based standards confirms that its purpose was to protect reliance on prior law, not to reassert the sexist assumptions rejected in *Goldfarb.*

Nor is that purpose rendered illegitimate by the fact that it is achieved through a temporary revival of an invalidated classification. We have recognized, in a number of contexts, the legitimacy of protecting reasonable reliance on prior law even when that requires allowing an unconstitutional statute to remain in effect for a limited period of time. See, *e. g., Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 87–89 (1982) (plurality opinion); *Buckley* v. *Valeo,* 424 U. S. 1, 142–143 (1976) *(per curiam); Chevron Oil Co.* v. *Huson,* 404 U. S. 97, 106–107 (1971). See also *Los Angeles Dept. of Water & Power* v. *Manhart,* 435 U. S. 702, 718–723 (1978). Although an unconstitutional scheme could not be retained for an unduly prolonged period in the name of protecting reliance interests, or even for a brief period if the expectations sought to be protected were themselves unreasonable or illegitimate, there is no indication that the offset exception suffers from either of these flaws. The duration of the exception is closely related to its goal of protecting only individuals who had planned their retirements in reliance on prior law, see *infra,* at 748–749, and appellee does not suggest that the expectations of those individuals, who hardly could have anticipated the adoption of the offset requirement, were unreasonable or illegitimate.

The protection of reasonable reliance interests is not only a legitimate governmental objective: it provides "an exceedingly persuasive justification" for the statute at issue here. See *Kirchberg* v. *Feenstra,* 450 U. S. 455, 461 (1981); *Personnel Administrator of Mass.* v. *Feeney,* 442 U. S. 256, 273 (1979). Appellee does not, and cannot, contest the Secretary's statement that "it is a significant and salutary goal to secure the retirement plans of our Nation's workers who in

good faith had long and reasonably relied on the provisions of the Social Security Act." Brief for Appellant 33. Instead, appellee contends that the only people who could justifiably have relied on an expectation of unreduced benefits are those who actually retired before the effective date of the offset provision and those individuals will not be required to offset their benefits. Brief for Appellees 28–29, and n. 21, 31–32. Congress determined, however, that many individuals adjusted their spending and savings habits prior to their retirements in expectation of receiving full spousal benefits as well as a government pension,[13] and we have no reason to doubt that conclusion. One commentator has explained:

> "Many couples have undoubtedly made retirement plans and adjusted the level of their private saving and investment in anticipation of retirement benefits from social security which include a special benefit for a spouse. An abrupt denial of benefits in these cases, even if the spouse who would have received them is shown to be not truly dependent on the other is clearly inequitable since the couple's savings and retirement plans would have

---

[13] See H. R. Conf. Rep. No. 95–837, p. 72 (1977) ("The managers are concerned that there may be large numbers of women, especially widows in their late fifties, who are already drawing pensions, or would be eligible to draw them within 5 years of the date of enactment of this bill, based on their non-covered work and whose retirement income was planned for on the assumption of the availability of full wife's or widow's benefits under social security"); S. Conf. Rep. No. 95–612, p. 72 (1977) (same); Staff of Senate Committee on Finance, 95th Cong., 1st Sess., Summary of H. R. 9346, the Social Security Amendments of 1977 as Passed by the Congress (P. L. 95–216) 7 (Comm. Print 1977) ("To assure that persons who have been counting on these benefits for many years and who are now at or near retirement age will not be adversely affected, H. R. 9346 includes a transitional exception under which certain individuals will not have their social security benefits as spouses reduced by the amount of their public pension. This exception applies to those who . . . would qualify for spouses benefits under social security under the law as in effect and as administered in January 1977").

been different had the spouse benefit not been anticipated. Thus, were it to be decided that wives should prove dependency in order to receive spouse benefits, a strong argument could be made for making such a change gradually so as to avoid inequities to couples approaching retirement who had anticipated that such benefits would be available to them and had made their retirement plans accordingly." M. Flowers, Women and Social Security: An Institutional Dilemma 41 (1977).

In short, particularly in the years immediately preceding retirement, individuals make spending, savings, and investment decisions based on assumptions regarding the amount of income they expect to receive after they stop working. For such individuals reliance on the law in effect during those years may be critically important.[14] In recognition of this fact, the offset exception, in the words of the Conference Report, protects "people who are already retired, or close to retirement, from public employment and who cannot be expected to readjust their retirement plans to take account of the 'offset' provision that will apply in the future." H. R. Conf. Rep. No. 95–837, p. 72 (1977); S. Conf. Rep. No. 95–612, p. 72 (1977). That purpose, consistent with the principle that "'[g]reat nations, like great men, should keep their word,'" *Astrup* v. *INS*, 402 U. S. 509, 514, n. 4 (1971), quoting *FPC* v. *Tuscarora Indian Nation*, 362 U. S. 99, 142 (1960) (Black, J., dissenting), provides an exceedingly persuasive justification for the gender-based classification incorporated in the offset exception.

## B

Having identified the legitimate and important governmental purpose of the offset exception, we have little trouble

---

[14] Indeed, the Social Security Act itself recognizes the critical importance of protecting an individual's expectation of benefits even in circumstances where payment is contrary to *current* law. The Act forbids recovery of such overpayments when the recipient is not at fault and recapture "would be against equity and good conscience." 42 U. S. C. § 404(b).

concluding that the means employed by the statute is "substantially related to the achievement of [that] objectiv[e]." *Wengler* v. *Druggists Mutual Insurance Co.*, 446 U. S. 142, 150 (1980). By reviving for a 5-year period the eligibility criteria in effect in January 1977, the exception is narrowly tailored to protect only those individuals who made retirement plans prior to the changes in the law that occurred after that date. Individuals who were eligible for spousal benefits before the law changed and who retire within five years of the statute's enactment may reasonably be assumed to have begun planning for their retirement prior to the adoption of the offset provision. See *supra*, at 747–748. Such persons, men as well as women, may receive spousal benefits unreduced by their government pensions, while those persons, men as well as women, who first became eligible for benefits after January 1977 may not.[15]

---

[15] The latter group includes persons who first became entitled to spousal benefits under the 1977 Amendments themselves as well as those whose eligibility was first established in judicial decisions issued from 1977 to the present. See n. 11, *supra*. Because the offset provision was enacted at the end of 1977, the only members of this group who, under the law in effect at any given time, might have expected to receive spousal benefits unreduced by their government pensions are those who became eligible during 1977 as a result of *Goldfarb* and other decisions announced that year. The Act protects the reliance interests of most such people, however, by providing that the offset applies only to applicants who file their claims for spousal benefits in or after December 1977, the month of enactment of the Amendments. 1977 Amendments § 334(f), Pub. L. 95–216, 91 Stat. 1546, note following 42 U. S. C. § 402 (1976 ed., Supp. V).

The reliance of appellee on the *Goldfarb* decision was frustrated not by operation of the exception provision but rather by the unfortunate timing of his retirement. After being informed that, as a result of the March 1977 *Goldfarb* decision, he would receive spousal benefits unreduced by his Government pension, Brief for Appellees 2, Mathews retired in October 1977 and filed his application for benefits on December 15. App. 4. If he had applied for benefits before December 1, he would have been exempt from the offset provision which, as noted, took effect that day. Alternatively, if he had not retired until after December 20, the day the 1977 Amendments were enacted, he would have known that he could not expect spousal bene-

Moreover, the offset exception was plainly adopted "through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women." *Mississippi University for Women* v. *Hogan*, 458 U. S., at 726 (footnote omitted). As the legislative history set out above demonstrates, Congress considered carefully and at length both the financial problems that led to the offset provision and the reliance interests that might be frustrated by that requirement. The solution finally adopted, after rejection of more expensive or impractical alternatives,[16] distinguishes Social Security applicants, not according to archaic generalizations about the roles and abilities of men and women, but rather according to whether they planned their retirements with the expectation, created by the law in effect in January 1977, that they would receive both full spousal benefits and a government pension.

## V

The exception to the pension offset requirement set out in § 334(g)(1) of the 1977 Amendments to the Social Security Act, while temporarily reviving the gender-based classifica-

---

fits unreduced by his Government pension and might therefore have altered his plans. Although the bind thus imposed on Mathews by the enactment and effective dates of the Amendments is regrettable, the statute is not rendered fatally underinclusive because it protects only expectations of substantially greater duration than his.

[16] See, *e. g.*, Staff of the House Committee on Ways and Means, 95th Cong., 1st Sess., WMCP: 95-57, Summary of the Principal Provisions of H. R. 9346, The Social Security Financing Amendments of 1977 As Passed By the House 4 (Comm. Print 1977) (House version proposing 6-month administration study of, *inter alia,* "various proposals to mitigate the cost impact of the recent *Goldfarb* decision on the system"); S. Rep. No. 95-572, p. 28 (1977) (describing consideration and rejection on grounds of potential abuse, inequity, invasion of privacy, and administrative difficulty of requirement that each applicant for spousal benefits prove dependency on spouse).

tion invalidated in *Califano* v. *Goldfarb,* is directly and substantially related to the important governmental interest of protecting individuals who planned their retirements in reasonable reliance on the law in effect prior to that decision. Accordingly, the judgment of the District Court is

*Reversed.*