In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1152

FREEDOM FROM RELIGION FOUNDATION, INC., ANNIE LAURIE GAYLOR, and DAN BARKER,

*Plaintiffs-Appellees*,

*v.*

JACOB J. LEW, Secretary of the Treasury, and JOHN A. KOSKINEN, Commissioner of Internal Revenue,

*Defendants-Appellants*.

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 11-cv-0626 — **Barbara B. Crabb**, *Judge*.

ARGUED SEPTEMBER 9, 2014 — DECIDED NOVEMBER 13, 2014

Before FLAUM, ROVNER, and HAMILTON, *Circuit Judges*.

FLAUM, *Circuit Judge*. The Freedom from Religion Foundation and its two co-presidents (collectively "the plaintiffs") filed this suit to challenge the constitutionality of § 107 of the Internal Revenue Code, also known as the parsonage exemption. The exemption excludes the value of employer-provided housing benefits from the gross income of any

"minister of the gospel." 26 U.S.C. § 107. The plaintiffs conceded in the district court that they did not have standing to challenge § 107(1), which applies to in-kind housing provided to a minister, but argued that they did have standing to challenge § 107(2), which applies to rental allowances paid to ministers. The district court agreed that the plaintiffs had standing to challenge § 107(2), and held that the subsection is an unconstitutional establishment of religion under the First Amendment.

We conclude that the plaintiffs lack standing to challenge § 107(2). We therefore do not reach the issue of the constitutionality of the parsonage exemption. The judgment of the district court is vacated and the case remanded with instructions to dismiss the complaint for want of jurisdiction.

## I. Background

The parsonage exemption, codified at 26 U.S.C. § 107, allows a minister to receive tax-free housing from his church, whether the church provides it directly (by giving the minister access to a church-owned residence) or indirectly (by giving the minister a rental allowance to obtain housing).[1] Non-

---

[1] Section 107 provides:

> In the case of a minister of the gospel, gross income does not include—(1) the rental value of a home furnished to him as part of his compensation; or (2) the rental allowance paid to him as part of his compensation, to the extent used by him to rent or provide a home and to the extent such allowance does not exceed the fair rental value of the home, including furnishings and appurtenances such as a garage, plus the cost of utilities.

26 U.S.C. § 107.

clergy must generally pay income tax on the value of their employer-provided housing unless they meet certain requirements, including that such housing be provided "for the convenience of the employer." *Id*. § 119(a).

Freedom from Religion Foundation (FFRF) is a Wisconsin-based organization of atheists and agnostics. Annie Gaylor and Dan Barker, also plaintiffs in this case, are the co-presidents of FFRF; they receive a portion of their salaries from FFRF in the form of a housing allowance. Because Gaylor and Barker are not ministers, they paid income tax on this portion of their salaries. Neither taxpayer sought to exclude this income on their federal income tax returns and neither has filed a claim for a refund after payment. The plaintiffs brought suit in the Western District of Wisconsin, claiming that § 107 violates the First Amendment because it conditions a tax benefit on religious affiliation.

In the district court, the government contended that the court was without jurisdiction to decide the case because the plaintiffs lacked standing. The plaintiffs conceded that they did not have standing to challenge § 107(1)—the exemption for housing provided in-kind by a church—because Gaylor and Barker do not receive in-kind housing from FFRF. That part of their challenge was dismissed, and the plaintiffs have not appealed that determination. As to § 107(2)—the rental-allowance exemption—however, the plaintiffs argued that they did have standing; for reasons we discuss below, the district court agreed. The court then proceeded to hold § 107(2) unconstitutional under the three-part test established in *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971). The government appeals both of these holdings.

## II. Discussion

The jurisdiction of federal courts is limited by Article III of the Constitution to "Cases" and "Controversies." U.S. Const. art. III, § 2. No "Case" or "Controversy" exists if the plaintiff lacks standing to challenge the defendant's alleged misconduct. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff bears the burden of establishing the required elements of standing. *Kathrein v. City of Evanston, Ill.*, 752 F.3d 680, 690 (7th Cir. 2014). The standing inquiry is "especially rigorous" when plaintiffs claim, as they do here, that "an action taken by one of the other two branches of the Federal Government was unconstitutional." *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997).

The "irreducible constitutional minimum of standing" requires the plaintiff to show that he has suffered (or is imminently threatened with) (1) a concrete and particularized "injury in fact" (2) that is fairly traceable to the challenged action of the defendant, and that is (3) likely to be redressed by a favorable judicial decision. *Lujan*, 504 U.S. at 560–61. Especially important here is the requirement that the plaintiff's injury be "concrete and particularized," meaning that "the injury must affect the plaintiff in a personal and individual way." *Id*. at 560 n.1. A "generally available grievance about government—claiming only harm to … every citizen's interest in proper application of the Constitution and laws" is not considered an "injury" for standing purposes. *Id*. at 573–74.

"The concept of a 'concrete' injury is particularly elusive in the Establishment Clause context … because the Estab-

lishment Clause is primarily aimed at protecting non-economic interests of a spiritual, as opposed to a physical or pecuniary, nature." *Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1250 (9th Cir. 2007) (citation omitted). It is clear, however, that a plaintiff cannot establish standing based solely on being offended by the government's alleged violation of the Establishment Clause. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485–86 (1982) (concluding that plaintiffs lacked standing because they "fail[ed] to identify any personal injury suffered by them *as a consequence* of the alleged [violation of the Establishment Clause], other than the psychological consequence presumably produced by observation of conduct with which one disagrees"); *Freedom from Religion Found., Inc. v. Obama*, 641 F.3d 803, 807 (7th Cir. 2011) ("[O]ffense at the behavior of the government, and a desire to have public officials comply with (plaintiffs' view of) the Constitution, differs from a legal injury.").

Although psychic injury alone is insufficient, there are a variety of ways for plaintiffs to demonstrate standing in Establishment Clause cases. For example, the Supreme Court has said that "plaintiffs may demonstrate standing based on the direct harm of what is claimed to be an establishment of religion, such as a mandatory prayer in a public school classroom." *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1440 (2011). Similarly, being exposed to religious symbols can constitute a direct harm. *See Doe v. Cnty. of Montgomery, Ill.*, 41 F.3d 1156, 1159 (7th Cir. 1994). The plaintiffs here, however, cannot rely on the direct harm doctrine, because § 107(2) does not require them to see or do anything.

Another way that plaintiffs in Establishment Clause cases often show standing is by relying on the special rule set forth in *Flast v. Cohen*, 392 U.S. 83 (1968). As a general rule, standing to challenge the legality of a government expenditure "cannot be based on a plaintiff's mere status as a taxpayer." *Winn*, 131 S. Ct. at 1442. Such suits are typically foreclosed because the harm is too widely shared, the financial injury to any given taxpayer is too slight, and the possibility of redress is too speculative to support standing under traditional principles. *Id*. at 1442–45. In *Flast*, however, the Supreme Court created an exception to this general rule: "[A] taxpayer will have standing … when he alleges that congressional action under the taxing and spending clause is in derogation of [the Establishment Clause]." 392 U.S. at 105–06. The Court, however, has since clarified the scope of *Flast*, holding that it only applies to taxpayer challenges involving specific government appropriations; *Flast* does not give taxpayers standing to challenge the constitutionality of tax credits or other "tax expenditures." *Winn*, 131 S. Ct. at 1447; *see id*. at 1450 (Kagan, J., dissenting) (characterizing the majority's holding as creating a "distinction in standing law between appropriations and tax expenditures"). As the parsonage exemption is a tax expenditure, plaintiffs cannot rely on the *Flast* exception to establish standing. *See* Staff of Joint Comm. on Taxation, 110th Cong., *Estimates of Federal Tax Expenditures for Fiscal Years 2007–2011*, at 32 (Comm. Print 2007) (identifying the parsonage exemption as a "tax expenditure").

A third way for individuals to establish standing in an Establishment Clause case, which plaintiffs rely on here, is to demonstrate that "they have incurred a cost or been denied a benefit on account of their religion. Those costs and benefits can result from alleged discrimination in the tax code, such

as when the availability of a tax exemption is conditioned on religious affiliation." *Winn*, 131 S. Ct. at 1440 (majority opinion). As an example, the *Winn* Court cited to its decision in *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 5–8 (1989) (plurality opinion), which held that a general-interest secular magazine—which had paid sales taxes on its subscription sales under protest and later sued to recover those payments—had standing to challenge a Texas sales tax exemption for periodicals that were published by a religious faith and consisted "wholly of writings promulgating the teaching of the faith." This approach does not rely on intangible psychic harm or the mere fact that a taxpayer's money helped to further an unconstitutional end. Rather, it bases standing on the allegation that the government's unconstitutional action caused the plaintiff a concrete, dollars-and-cents injury.

The plaintiffs here argue that they have standing because they were denied a benefit (a tax exemption for their employer-provided housing allowance) that is conditioned on religious affiliation.[2] This argument fails, however, for a

---

[2] FFRF's standing in this suit is based on the doctrine of associational standing.

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 282 (1986) (quoting *Hunt v. Washington State Apple Advertising Com'n*, 432 U.S. 333, 343 (1977)). Because we hold that the individual plaintiffs in this case (FFRF members) do not have standing, it

simple reason: the plaintiffs were never *denied* the parsonage exemption because they never asked for it.[3] Without a request, there can be no denial. And absent any personal denial of a benefit, the plaintiffs' claim amounts to nothing more than a generalized grievance about § 107(2)'s unconstitutionality, which does not support standing. *Lujan*, 504 U.S. at 573–74 ("[A] plaintiff raising only a generally available grievance about government … does not state an Article III case or controversy."). In other words, the mere fact that the tax code conditions the availability of a tax exemption on religious affiliation does not give a plaintiff standing to challenge that provision of the code. A plaintiff cannot establish standing to challenge such a provision without having personally claimed and been denied the exemption.

Though the Supreme Court has never squarely addressed the issue presented here, the Court's precedent supports our conclusion. In *Allen v. Wright*, the plaintiffs sued the IRS for failing to deny tax-exempt status to racially discriminatory private schools. 468 U.S. 737, 745 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014). The plaintiffs, parents of African-

---

follows that FFRF lacks associational standing. FFRF has not advanced any argument suggesting that the organization might have standing independent of that of its members.

[3] The plaintiffs could have sought the exemption by excluding their housing allowances from their reported income on their tax returns and then petitioning the Tax Court if the IRS were to disallow the exclusion. 26 U.S.C. § 6213(a). Alternatively, they could have adopted the approach taken by the plaintiff in *Texas Monthly*, *see* 489 U.S. at 6, and paid income tax on their housing allowance, claimed refunds from the IRS, and then sued if the IRS rejected or failed to act upon their claims. *See* 26 U.S.C. § 7422; 28 U.S.C. § 1346(a)(1).

American children attending public schools, attempted to show standing by arguing that they were "harmed directly by the mere fact of Government financial aid to discriminatory private schools."[4] *Id.* at 752. The Court found that they did not have standing. *Id.* at 766. Even if the plaintiffs' asserted basis for standing was interpreted as a claim of "stigmatic injury … suffered by all members of a racial group when the Government discriminates on the basis of race," the Court held that such injury confers standing "only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." *Id.* at 754–55 (quoting *Heckler v. Mathews*, 465 U.S. 728, 740 (1984)). Unlike the plaintiff in *Heckler*, a male who "personally ha[d] been denied [Social Security] benefits that similarly situated women receive[d]," *see* 465 U.S. at 740 n.9, the *Allen* plaintiffs did "not allege a stigmatic injury suffered as a direct result of having *personally been denied* equal treatment." 468 U.S. at 755 (emphasis added).

The *Allen* Court pointed to its holding in *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163 (1972), as support for this conclusion. In that case, the Court determined that the plaintiff, an African-American, did not have standing to challenge a club's racially discriminatory membership policies because he had never applied for membership, and therefore "was not injured by Moose Lodge's membership policy." *Id.* at 166–67. It apparently did not matter to the Court that such

---

[4] The plaintiffs also argued that they had standing because the tax exemptions at issue "impair[ed] their ability to have their public schools desegregated." *Allen*, 468 U.S. at 752–53. The Court rejected this standing argument because the alleged injury was not "fairly traceable" to the government conduct challenged as unlawful. *Id.* at 757.

an application would have been futile because the club's by-laws only allowed Caucasians to become members. Futile or not, a request for membership was necessary to establish standing because, without it, no injury had occurred. In contrast, the *Moose Lodge* plaintiff *did* have standing to challenge the lodge's refusal to serve him when he attended the club as a guest because, in that instance, he had requested and was denied a benefit. *Id*. at 165, 170.

Like the plaintiffs in *Allen* and *Moose Lodge*, the plaintiffs here are members of a group (in this case, the non-religious) that is allegedly suffering illegal discrimination. But the mere fact that discrimination is occurring is not enough to establish standing, absent being "personally denied equal treatment." *Allen*, 468 U.S. at 755.[5] Allowing members of discriminated-against groups who have not suffered a particularized injury to bring suit would not only be unconstitu-

---

[5] Our conclusion is also generally consistent with the Fifth Circuit case, *Apache Bend Apartments, Ltd. v. United States*, 987 F.2d 1174 (5th Cir. 1993) (en banc). There, the Fifth Circuit concluded that the plaintiffs did not have "prudential standing" to raise an equal protection challenge to special transition rules offered to a few designated taxpayers by the Tax Reform Act of 1986. *Id*. at 1175–77. In distinguishing the case from *Heckler*, the court noted that "the plaintiffs here were not *personally denied* benefits under the transition rules" because they "never even sought such benefits" under the rules. *Id*. at 1178 n.3. Because the court in *Apache Bend* based its decision on the doctrine of prudential standing, it declined to decide whether the plaintiffs had alleged an injury sufficient to satisfy *constitutional* standing requirements. *Id*. at 1176–77. The doctrine of prudential standing, we note, is somewhat unsettled after the Supreme Court's recent decision in *Lexmark*, 134 S. Ct. 1377. Because we hold that the plaintiffs in this case do not meet the constitutional standing requirements, we need not reach the question of prudential standing.

tional, it would also create practical difficulties by opening the door to constitutional challenges to any tax exemption that a given individual suspects he may not be entitled to—without first giving the IRS and the Tax Court the opportunity to determine the proper construction and application of the law.

Plaintiffs, apparently recognizing the constitutional and practical problems of extending standing to anyone that is part of an allegedly discriminated-against group, suggest a limiting principle: only those discriminated-against taxpayers who are "similarly situated" to the taxpayers receiving the exemption have standing to sue. Here, Gaylor and Barker argue that they are similarly situated to the ministers receiving the § 107(2) exemption because they too receive a housing allowance. The *only* reason, they argue, that they cannot take advantage of § 107(2) is that they are not "ministers of the gospel."

We reject this proposal for multiple reasons. First, it fails to address the heart of our standing inquiry here—whether plaintiffs have suffered a constitutionally cognizable injury. Being part of a small group that suffers no injury is no different from being part of a large group that suffers no injury; the size of the group makes no difference. *See Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Norton*, 422 F.3d 490, 496 (7th Cir. 2005). Second, there is, of course, a crucial difference, other than religious belief, between the plaintiffs and the ministers who take advantage of § 107(2)—the latter group has actually claimed the exemption. The Court in *Heckler* found that merely being "similarly situated" is not enough—the plaintiff there had standing because he "personally ha[d] been denied benefits that similarly situated

women receive[d]." 465 U.S. at 740 n.9. Third, the plaintiffs offer no guidance on how to apply a vague "similarly situated" standard in the tax exemption context. When, exactly, is a plaintiff similar enough to the taxpayers who receive the allegedly illegal exemption? In the case of the parsonage exemption, would it be enough that an employee receives a housing allowance? Or must the employee be some type of organizational leader, like Gaylor and Barker? Or perhaps an employee is not similar enough unless he is a leader who also provides guidance to a flock of followers? None of these distinctions is obviously correct and plaintiffs offer no guidance on how to draw a line. Finally, it is quite possible that the IRS or the Tax Court will interpret an exemption to apply to a party that is "similarly situated." And a party who receives an exemption has no standing to challenge it. We think it unlikely that § 107(2) will be interpreted to apply to the plaintiffs in this case, but there may be many closer cases. For example, the parsonage exemption applies on its face only to a "minister of the gospel." One could easily imagine a "similarly situated" non-Christian clergyman challenging the constitutionality of this law prior to 1966, when the Tax Court of the United States interpreted the exemption to reach "the equivalent of 'ministers' in other religions." *Salkov v. Commissionr*, 46 T.C. 190, 194 (1966) (interpreting § 107(2) to apply to a Jewish cantor). We thus think it important to allow the IRS and the Tax Court to interpret the boundaries of a tax provision before we assess its constitutionality.

The district court concluded that the plaintiffs in this case do have standing for a number of reasons, none of which we find persuasive. First, the district court worried that the government's view might insulate § 107(2) from review entirely. Indeed, some courts, including ours, have previously held

that a party cannot challenge an underinclusive tax exemption in a deficiency proceeding because the court would not have the power to provide the plaintiff with the tax break. *See, e.g.*, *Templeton v. Commissioner*, 719 F.2d 1408, 1412 (7th Cir. 1983). But this aspect of *Templeton* and the other cases cited by the district court is no longer good law—the Supreme Court has squarely held that a plaintiff can have standing to challenge an underinclusive tax exemption even if the only available remedy is removing the exemption rather than extending it to the plaintiff. *See Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 227 (1987). In any case, "[t]he assumption that if [the plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing." *Valley Forge*, 454 U.S. at 489 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974)).

Second, the district court thought that it would "serve no legitimate purpose to require plaintiffs to claim the exemption and wait for the inevitable denial of the claim" because the "plaintiffs' alleged injury is clear from the face of the statute and … there is no plausible argument that the individual plaintiffs could qualify for an exemption." *Freedom from Religion Found., Inc. v. Lew*, 983 F. Supp. 2d 1051, 1055–56 (W.D. Wis. 2013). Requiring the plaintiffs to formally request the parsonage exemption, the district court said, would be a "waste" of "time," and would be "unnecessary busy work." *Freedom from Religion Found., Inc. v. Lew*, No. 11-cv-0626, at 8–9 (W.D. Wis. Aug. 29, 2012) (order denying defendants' motion to dismiss). In support of this view, the district court cited a Fourth Circuit case, *Finlator v. Powers*, 902 F.2d 1158 (4th Cir. 1990), which rejected a standing argument similar to the one the government makes here. *Finlator* involved a North Carolina law exempting "Holy Bibles" from the state sales

tax. *Id*. at 1159. The plaintiffs—purchasers of various secular and (non-Christian) sacred books that were taxed at the regular rate—sued the North Carolina Secretary of Revenue, contending that the law was unconstitutional. *Id*. The Secretary argued that the court lacked jurisdiction because the plaintiffs had not taken necessary "minimal steps to ensure their standing," such as refusing to pay the tax or paying the tax under protest and subsequently contesting their liability. *Id*. at 1161.

The Fourth Circuit concluded that the plaintiffs had standing. The court based its holding largely on prudential grounds:

> Realistically, if this court were to deny standing in this case, the appellants would simply protest the payment and collection of the State's sales tax, and refile their suit. We do not believe that this additional requirement would … contribute in any way to our ability to decide a question presented and contested by parties having a demonstrated interest and stake in its resolution.

*Id* at 1162. The court also believed that "it would be an untenable waste of judicial resources to deny the [plaintiffs] standing in this case given the patent unconstitutionality" of the challenged exemption. *Id*.

Insofar as the district court and the Fourth Circuit in *Finlator* suggest that asking for and being denied a tax exemption should not be a requirement for establishing standing because doing so would be a waste of time, we cannot agree. Perhaps these courts are correct that requiring the plaintiffs

to request and be denied the parsonage exemption will be a "futile exercise,"[6] *Freedom from Religion Found.*, No. 11-cv-0626, at 8–9, that will not improve the court's ability to resolve the constitutional challenge, but this is beside the point. The Constitution does not allow federal courts to hear suits filed by plaintiffs who lack standing, and standing is absent here because the plaintiffs have not been personally denied the parsonage exemption. Article III "is not merely a troublesome hurdle to be overcome if possible so as to reach the 'merits' of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers." *Valley Forge*, 454 U.S. at 476.

The *Finlator* court, however, concluded that the plaintiffs in that case had standing for an additional reason: they "did suffer actual injury" because Bible purchasers automatically received a sales tax exemption, while purchasers of other texts could receive the exemption only by taking the extra step of protesting payment or filing a refund suit. 902 F.2d at 1162. "Simply stated," the court said, "an injury is created by the very fact that the [government] imposes additional burdens on the [plaintiffs] not placed on purchasers of 'Holy Bibles.'" *Id*. In the case before us, neither party explains how a taxpayer actually goes about "claiming" the parsonage exemption, and the plaintiffs do not argue that they face any

---

[6] The government argues that requesting the exemption might not be futile because there is a chance that the IRS would grant the plaintiffs a rental allowance exemption on the theory that atheism can be treated as a "religion" for Establishment Clause purposes. Whether or not this is true, it is irrelevant: to establish standing, a plaintiff must request (and be denied) a benefit, even if, practically speaking, the request has no chance of success. *See, e.g.*, *Moose Lodge*, 407 U.S. at 166–67.

additional burden in claiming the exemption that ministers do not.

Finally, the district court observed that the Supreme Court has frequently reached the merits in cases where a plaintiff challenged a tax exemption under the Establishment Clause, even when it was not clear that the plaintiff had been personally denied the exemption before filing suit. For example, in *Walz v. Tax Commission of the City of New York*, 397 U.S. 664, 666–67 (1970), an owner of real estate challenged a New York property tax exemption for religious, educational, or charitable nonprofit organizations. Nothing in the Court's opinion indicates that the plaintiff sought a property tax exemption prior to filing his suit which the Court rejected on the merits. *Id*. at 680. But the *Walz* Court never discussed standing. Thus, the case has no force in the standing context: "When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed." *Winn*, 131 S. Ct. at 1448.

To summarize, plaintiffs do not have standing to challenge the constitutionality of the parsonage exemption. A person suffers no judicially cognizable injury merely because others receive a tax benefit that is conditioned on allegedly unconstitutional criteria, even if that person is otherwise "similarly situated" to those who do receive the benefit. Only a person that has been denied such a benefit can be deemed to have suffered a cognizable injury. The plaintiffs here have never been denied the parsonage exemption because they have never requested it; therefore, they have suffered no injury.

### III. Conclusion

Because the plaintiffs do not have standing to challenge the parsonage exemption, we VACATE the judgment of the district court and REMAND with instructions to dismiss the complaint for want of jurisdiction.