Paul MORSE; the New Hampshire People's Alliance; Beatrice DesMarais; Richard Duckoff; Elliot Hansen; and Michael Pickering, Plaintiffs,

v.

Paul R.R. MARTINEAU; Jacqueline A. Brinn; Raoul L. Billy; Peter McDonough; Joan E. Walsh and Tess Petix, Defendants.

Civ. A. No. 84–446–L.

United States District Court,
D. New Hampshire.

May 3, 1988.

Jack Novik, New York City, Richard Hesse, and Shaheen, Cappiello, Stein & Gordon, Robert A. Stein, Concord, N.H., for all plaintiffs.

Backus, Shea & Meyer, John Meyer, Manchester, N.H. for DesMarais, Duckoff and Hansen.

Martha Gordon, Devine Millimet Stahl and Branch, Manchester, N.H., for Martineau, Brinn and Billy.

New Hampshire Atty. General's Office, Douglas L. Patch, Concord, N.H., for Tess Petix.

## OPINION

LAGUEUX, District Judge.[*]

In the matter before the Court, the New Hampshire People's Alliance (the Alliance) and several individuals challenge the method by which the Board of Registrars (the Board) of the City of Manchester, New Hampshire select volunteer deputy registrars who assist in performing the task of registering voters. Although plaintiffs assert deprivation of several constitutional rights, the heart of their case, as will be seen, lies in the allegation that certain policies and practices of the Board were arbitrarily applied to the Alliance so as to deny it the equal protection of the laws. Prior to addressing the merits of these claims, however, it is necessary to detail the somewhat lengthy and involved series of events that gave rise to the present dispute between the parties.

Plaintiffs in this action can be subdivided into two groups. These groups are: one, the organization known as the New Hampshire People's Alliance, and two, the individuals who were candidates for deputization. The Alliance is a state-wide, nonprofit organization whose primary purpose is to increase voter participation. To this end, the Alliance belongs to an organization called the New Hampshire Voter Reg-

---

[*] Of the District of Rhode Island, sitting by designation.

istration Coalition (the Coalition) (Tr. 2–4). The Coalition is a state-wide association of approximately twenty-seven member organizations united for the common purpose of increasing voter registration (Tr. 1–21, 22). One of the twenty-seven groups that belongs to the Coalition along with the Alliance is the New Hampshire League of Women Voters (the League) (Tr. 1–21).

The five individuals involved in this case are Paul Morse, Beatrice DesMarais, Richard Duckoff, Elliot Hansen and Michael Pickering. Paul Morse is a member and Director of the Alliance (Tr. 2–4). In both 1983 and 1984, Mr. Morse was a resident and registered voter of the City of Concord, New Hampshire (Tr. 2–29). Subsequently, he moved to the Town of Loudon, New Hampshire where he is currently residing (Tr. 2–3, 29). Mr. Morse has never been registered to vote in the City of Manchester (Tr. 2–29, 30).

The other four individual plaintiffs, DesMarais, Duckoff, Hansen and Pickering are purported residents and registered voters of the City of Manchester. Duckoff and Hansen, moreover, are members of the Alliance; the other two are not.

Of the six original defendants named in this case, five comprised the Board. At the time plaintiffs filed their complaint, these individuals were Paul R.R. Martineau, Jacqueline A. Brinn, Raoul L. Billy, Peter McDonough and Joan E. Walsh. Traditionally, the Board was comprised of three members, a chairman, a clerk and a regular member who rotated positions on an annual basis (Pl.Ex. 27 at 6–7). In approximately 1983, two ex-officio members were added each of whom possessed a vote (Pl.Ex. 27 at 10–11). At the time of the events precipitating this litigation, the Chairman of the Board was Peter McDonough; the Clerk of the Board was Jacqueline A. Brinn; Raoul L. Billy was the Board's regular member; and Paul Martineau because he was on the Board of Assessors, and Joan Walsh because she was City Clerk, constituted the Board's two ex-officio members. The sixth defendant in this case was Tess Petix of whom we shall hear more later.

Generally, the Board meets on a monthly basis (Pl.Ex. 27 at 11–12). The Board, however, meets more often if special circumstances so require (Pl.Ex. 27 at 12). These special meetings occur when a member of the Board who believes a special meeting is justified submits a request in writing to the Chairman and other members of the Board (Pl.Ex. 27 at 17). The Chairman then schedules a meeting to occur upon a particular date (Pl.Ex. 27 at 13).

Article V Section 5.15 of the Charter of the City of Manchester empowers the Board from time to time "to appoint such deputies as may be required, who shall perform all duties as directed by the Board of Registrars, including registration of voters." With the exception of two members of the Chamber of Commerce who were deputized on one occasion, the Board has traditionally deputized four members of the League annually to serve as volunteer registrars (Pl.Ex. 27 at 93–94). While the number of registrars has varied depending upon the Board's immediate need, the pool from which the Board has designated deputies has remained constant (Tr. 2–159). This is due to the fact that until the Coalition's 1984 request, the League was the only group to have regularly requested deputization for its members (Tr. 2–175).

Each year the League submits a list to the Board of potential candidates for deputization. The Board then swears in the persons named on the list *ipso facto* (Tr. 2–163–164). No investigation takes place by the Board regarding the character or integrity of the potential deputies (Tr. 2–163). The Board assumes that the League has already investigated them (Tr. 2–163).

After an individual is sworn in as a deputy registrar, he or she is given approximately fifteen minutes to one-half hour of basic training (Tr. 2–104). The designated deputy must learn how to fill out a voter registration card properly and to recognize the provisions of the law that must be followed (Tr. 2–104). Having achieved deputy registrar status, the individual is on call to perform the duties of a deputy registrar. Either at the request of the League, or upon the initiative of the Board itself,

deputies will be sent to the homes of persons who desire to be registered to vote or to a designated outreach function (Tr. 3–83).

As previously noted, the sixth defendant in this case was Tess Petix, Director of the State Division of Human Resources. She was later dismissed as a party, but it is the Alliance's concealment from the Board of her interpretation of federal law prohibiting "agency employees" from providing "assistance" in connection with any voter registration activity that forms the crux of this litigation.

The relevant events in this matter commenced in January of 1984, when Sister Helen Girard, Judy Camire and Joanne O'Rourke wrote to Mrs. Brinn on behalf of the Coalition requesting "a meeting of a few Coalition representatives with the Board of Election Registrars on January 12, 1984." (Pl.Ex. 4). The purpose of this meeting was "to explore the possibility of registering voters in commodity lines on January 31st and February 1st at the Navy–Marine Armory and John F. Kennedy Coliseum." (Pl.Ex. 4).

During the first two months of 1984, the Board was extremely busy preparing for the New Hampshire Presidential primary on February 28th and a special election (Pl.Ex. 27 at 116) (Tr. 1–61) (Tr. 3–12). As a result of this activity, the Board did not respond to the Coalition's January letter (Pl.Ex. 27 at 116) (Tr. 1–24).

Despite having received no response from the Board regarding the request, the Coalition proceeded to engage in two voter registration activities during the week of February 13th. The first activity was targeted at a low-income housing project in the City of Manchester known as Elmwood Gardens (Tr. 1–27). Coalition members went door-to-door at the housing project distributing leaflets and attempting to convince possible eligible registered voters to travel to downtown Manchester to register to vote (Tr. 1–28). In order to alleviate the inconvenience in making this trip, the Coalition offered to provide potential registrants with child care services and transportation from the local community center to the city

clerk's office (Tr. 1–28). This activity was repeated for Rimmon Heights, another low-income housing project in the City of Manchester (Tr. 2–11).

At the same time these activities were taking place, Paul Morse or another member of the Alliance asked Anne McDonough (no relation to defendant Peter McDonough), President of the League of Women Voters, whether the League would do door-to-door canvassing at the Rimmon Heights and Elmwood Garden projects in February of 1984 (Tr. 3–65). She refused this request on the grounds that it was coercive in nature and "inconsistent with any registration that the League had ever done." (Tr. 3–66). Previously, the League had conducted registration activities at the New Hampshire Mall, the Riverfest and a number of high schools and businesses in the City of Manchester (Tr. 3–47). These activities, however, did not involve door-to-door solicitation (Tr. 3–48).

Towards the middle of the week-long registration drives, the Coalition put out a press release discussing the details of the group's registration efforts (Tr. 2–12). In the release, the Coalition indicated that it had requested a meeting with the Board but had received no response.

After the press release was issued, Paul Morse received a phone call from Peter McDonough (Tr. 2–13). In the conversation that ensued McDonough indicated that he had never received the January 3rd letter from the Coalition (Tr. 2–14). Consequently, Morse forwarded a copy of the original letter along with a second letter, dated February 4, 1984, requesting to meet with the Board between the 15th and the 30th of March (Pl.Ex. 5). The second letter also discussed the Coalition's recent registration drives at Rimmon Heights and Elmwood Gardens (Pl.Ex. 5).

On March 7th or 9th, Mr. Morse received a letter from Mrs. Brinn indicating that the Board would be unable to meet with the Coalition because of vacation schedules of some of the Board members (Tr. 2–15). The letter went on to indicate that the Board would get back in touch with the

864

Coalition in the first week of April (Tr. 2–15).

Towards the end of the first week of April, Mr. Morse called the Board (Tr. 2–15). Subsequently, on April 19, 1984, Mrs. Brinn sent Mr. Morse a letter "to confirm a meeting scheduled on Thursday April 26, at 5:00 p.m. for the purpose of discussing the possibility of deputizing members of your organization to register voters in the City of Manchester." (Pl.Ex. 6). In preparation for this meeting the Coalition formed a delegation of six people to meet with the Board (Tr. 2–16). They were Mark McKenzie, executive vice-president of the AFL–CIO; Janet Schaffer, Director of New Hampshire Front Lash; Chrisinda Lynch, who was working for the New Hampshire Coalition Against Family Violence; Paul Morse; State Representative Joanne O'Rourke; and Sister Helen Girard of the Sisters of Mercy Women's Action Committee (Tr. 2–16).

The day of the April 26th meeting with the Board arrived. Just prior to the meeting, outside on the street, the members of the Coalition delegation held a strategy session regarding what has become known as the Tess Petix letter (Pl.Ex. 11) (Tr. 2–37). In February of 1984, Tess Petix, Director of the Division of Human Resources wrote to Mrs. Shirley Pond, Executive Director of Tri–County CAP, in response to "other CAP'S [inquiries] about the feasibility/legality of voter registrars setting up a table in the cheese lines ..." (Pl.Ex. 11). Petix first cited certain provisions of federal law which prohibited "any voter registration activities" from being conducted in connection with any activity funded by the Community Services Block Grant program (i.e. the cheese lines). The letter went on to advise:

We are, therefore, notifying you in writing that *no political activities of any kind* are to be allowed by Tri–County CAP as subgrantee of the Division of Human Resources where the use of Community Services Block Grant funds are in any way involved.

(Pl.Ex. 11, emphasis in original).

The Coalition, specifically Paul Morse, became aware of this letter on March 2,

1984 (Tr. 2–17). Upon receiving the letter, Mr. Morse contacted Chrisinda Lynch, who, in turn, contacted Susan McLane, State Senator and Chair of the Public Institutions, Health and Welfare Committee (Tr. 2–19). Senator McLane proceeded to initiate the process of obtaining a clarification of the regulation and the Petix ruling from the State Attorney General's Office (Tr. 2–19).

Outside the offices of the Board, Mr. Morse raised the question of whether the Coalition should alert the Board to the content of the Tess Petix letter. The Coalition "decided as a group that [it] would not bring it up." (Tr. 2–20, 38). Several reasons premised the Coalition's decision on this matter. First, the Coalition was "in the process of getting the clarification from the Attorney General's Office." (Tr. 2–20). Additionally, the Coalition "didn't want to give the Board a reason to refuse them." (Tr. 2–20).

Once the April 26th meeting began, discussion focused upon two areas. Mark McKenzie proposed a trial period for deputization specifically in connection with cheese line distributions that were scheduled to take place on May 22nd and May 23rd (Tr. 2–66, 67). In addition, there was some discussion regarding deputizing Coalition members in a generalized way apart from the cheese line distribution proposal (Tr. 2–126).

In connection with both these matters, members of the Board voiced essentially two concerns. Mr. Martineau indicated he was concerned that the Coalition contained member organizations that were partisan in nature (Tr. 2–181, 182, 184). Miss Walsh's primary concern was over cheese line deputization. She believed that individual voters should take the initiative in registering to vote (Tr. 2–115). It was her belief that even if the Coalition members managed to register additional voters through the deputization process, the Coalition could not guarantee these individuals would actually vote (Tr. 2–115, 189). There were also comments made at the meeting to the effect that cheese distribution could

be perceived as a *quid pro quo* for registration—"like giving lollipops to children for being good." (Tr. 1–42).

In addition to a discussion of these concerns, the following conversation took place between Mrs. Brinn and Sister Girard. Mrs. Brinn asked Sister Girard whether the Coalition members would "go on [the Board's] guidelines, go where we told them, et cetera" if they were indeed deputized (Pl.Ex. 27 at 129). Sister Girard answered, "For a while." (Pl.Ex. 27 at 129). Miss Walsh apparently overheard this conversation. She testified that a direct question was asked of the assembled group "whether they would follow the rules and regulations of the law and go where the Board asked them to go when they asked them to go." (Tr. 2–157, 158). In response to this question, Miss Walsh heard from "a woman" seated to her right: "Well, maybe at first we will." (Tr. 2–158).

The April 26th meeting lasted for approximately one hour (Tr. 2–189). It ended by the Board indicating that it would consider the Coalition's request and get back to the Coalition in about one week (Tr. 1–42, 43).

Paul Morse felt "very positive" that the Board was "receptive" to the Coalition's application for deputization (Tr. 2–22, 39). This indeed was the general feeling of the Board members at that time. Paul Martineau would have voted to deputize Coalition members on a trial basis after the meeting (Tr. 2–190). His concern of Coalition partisanship did not "disqualify them in his mind." (Tr. 2–183). Peter McDonough continued to maintain a "neutral position" on deputizing Coalition members (Tr. 3–18). Joan Walsh maintained her "concern" regarding cheese line deputization that she possessed prior to the meeting but was not "opposed" to deputization in general (Tr. 2–126). Mrs. Brinn felt the same as Walsh and McDonough (Pl.Ex. 27 at 133), and Raoul Billy generally voted on the recommendations of Walsh and Brinn (Tr. 2–206).

After the April 26th meeting between the Board and the Coalition had ended, the Board met briefly among themselves to discuss the content of the meeting (Tr. 2–189). At this meeting, each of the Board members reexpressed the concerns that they had just previously vocalized to the Coalition. At the completion of this "short discussion," the Board agreed to meet sometime in the near future (Tr. 2–190).

A week passed by without the Board acting on the Coalition's request for deputization. As a result, Mr. Morse called Mr. McDonough to inquire as to the status of the Coalition's application (Tr. 3–18). Without consulting the other members of the Board, Mr. McDonough told Mr. Morse to submit four names for consideration (Tr. 3–18).

On May 9, 1984, Mr. Morse wrote to the Board "on behalf of the Coalition." In his letter, Mr. Morse designated the four persons whom the Coalition initially wanted deputized to conduct voter registration. They were: Richard Duckoff, Eileen Brady, Beatrice DesMarais and Elliot Hansen (Pl.Ex. 7). In addition to supplying the Board with these four names, Mr. Morse requested that the Board inform the Coalition within the week of the Board's decision.

> It is vital to our planning regarding the upcoming cheese distribution, (Manchester: May 22 to May 25), to know by *Monday morning* who you will be deputizing and when they could receive some basic training from the Board concerning their responsibilities as deputies.

> Our next meeting will be: May 14th and it is important for us to know what your decision is and what we need to do. The cheese distribution is looked upon by the Coalition as our most important activity and there will not be another commodity distribution until September.

(Pl.Ex. 7, emphasis in original).

At this point, a slight digression is necessary in order to consider the relationship between the four individuals designated for deputization and the main thread of events in this case. Eileen Brady never joined as a plaintiff in this case. The submission of her name to the Board thus, is not material to the present dispute.

Beatrice DesMarais is a named plaintiff in this action, but she did not testify at trial. It was unknown at the time of trial whether she was ready, willing and able to be a deputy.

Elliot Hansen, another plaintiff, in 1984 worked for Community Services, Incorporated, a company which "provided an agency to administer group homes for adult retarded in the City of Manchester." (Tr. 3–99). In his spare time Mr. Hansen worked for the Alliance of which he was a member (Tr. 3–100).

Sometime prior to the April 26th meeting, Mr. Morse suggested to Mr. Hansen that he should be deputized as a volunteer registrar (Tr. 3–100). Mr. Hansen agreed, and as a result, Mr. Hansen's name was placed upon the list which the Coalition submitted to the Board (Tr. 3–100). Mr. Hansen did not go down to the Board himself to become deputized; his work schedule did not permit him an opportunity to do so (Tr. 3–111).

Unlike Mr. Hansen, Richard Duckoff did contact the Board in his individual capacity. Towards the end of 1983 or the beginning of 1984, Mr. Duckoff telephoned Jacqueline Brinn and asked her if he might become deputized (Tr. 3–120). Mrs. Brinn indicated to Mr. Duckoff that the Board was open from nine to five every day and from seven to nine one night a week (Tr. 3–121). Mrs. Brinn also claims she told Mr. Duckoff that if he wanted to become deputized he would have to "put it in writing" to be approved by the Board (Pl.Ex. 27 at 119). Mr. Duckoff, however, denies that Mrs. Brinn ever told him to make a written application for deputization to the full Board (Tr. 3–131).

Whatever the precise content of the conversation between those two individuals, it is clear that Mr. Duckoff was quite argumentative ("rude") to Mrs. Brinn (Pl.Ex. 27 at 118). As a result, she was unable to answer him completely (Pl.Ex. 27 at 119). The conversation ended with Mrs. Brinn indicating to Mr. Duckoff that there was a "roomful of people" and that she had to leave the phone (Pl.Ex. 27 at 120). Mr. Duckoff never followed up this conversation in any manner whatsoever (Tr. 3–110).

Rather, like Hansen and DesMarais, he provided his name to Mr. Morse who, in turn, relayed it to the Board (Tr. 3–110).

No action was taken by the Board on the Coalition's request between the time they received the May 5th letter and May 16th. On the latter date, however, Joan Walsh received a telephone call from Nick Lorang of Southern New Hampshire Services (Tr. 2–134). In this conversation Mr. Lorang told Miss Walsh that he had spoken to representatives of the Alliance and had been told by them that they were to be deputized to register voters at the "Cheese Lines" starting on May 22nd (Pl.Ex. 8). Mr. Lorang proceeded to advise Miss Walsh of a regulation that prohibited registering voters at cheese lines (Pl.Ex. 8). Mr. Lorang further indicated that he had spoken to Mr. Morse whom "he believ[ed], was aware of the regulation." (Pl.Ex. 8). The Attorney General's Office, however, was researching the issue of cheese line registration and was to render its opinion on the regulation in the near future (Pl.Ex. 8).

Immediately after this conversation with Mr. Lorang, Miss Walsh sent a memo to Peter McDonough outlining the conversation (Tr. 2–134). In that letter she admonished: "If Mr. Morse was, in fact, aware of this regulation, he and his group should be taken to task. I do not believe the Board should consider the Alliance's request any further." (Pl.Ex. 8).

In response to the Walsh memorandum of May 16th, a Board meeting was called for the next day, May 17th (Tr. 3–19). Mr. McDonough was absent from this meeting. At the May 17th meeting, the four members of the Board that were present voted to deny the Coalition's request for deputization. The basis for this denial was reflected in a letter sent by Peter McDonough to Paul Morse on May 18, 1984.

We were advised of a regulation prohibiting any voter registration activities during Cheese Distributions and were furnished a copy of a letter dated February 16 from Tess Petix, Director, Division of Human Services to Gale Hennessy, Executive Director, Southern New Hampshire

Services, Inc. We were given to understand that you have been well aware of this regulation. The Board, with four of its five members present, met at 12:30 P.M. May 17. The Board was of the opinion that if you and representatives of the Coalition were, in fact, aware of the regulation, you were less than candid with us and approached the problem of registering voters in a questionable manner.

On motion made and duly seconded, it was unanimously voted that your request be denied, that no representatives of the Coalition or the N.H. People's Alliance be deputized to register voters in the City of Manchester.

(Pl.Ex. 9).

Upon receiving the Board's decision, Mr. Morse telephoned Joan Walsh to indicate that he felt the Board had acted hastily (Tr. 2–27). Mr. Morse told her that the Coalition had been in the process of seeking a clarification from the Attorney General's Office, had in fact received the clarification, and was indeed allowed to conduct registration activities at commodity lines (Tr. 2–27). Miss Walsh replied that the recent Attorney General ruling on the matter had no bearing on the Board's decision (Tr. 2–27).

In an attempt to repair the damage that was done, the Coalition had Janet Schaffer draft a letter dated May 21st to Peter McDonough requesting that the Board reconsider its decision (Tr. 2–27, 28) (Pl.Ex. 10). The letter indicated that there had been "a serious misunderstanding" between the Board and the Coalition. It then acknowledged the feeling that the Board believed the Coalition had "misled them concerning registration on Commodity Assistance lines and the Federal Law." The letter proceeded to indicate that the Coalition had been aware of the Tess Petix letter but that the letter was legally incorrect:

> Quite frankly, while we were aware of the letter from Tess Petix, we were also aware that the ruling to which she refers in her letter covers *only* employees of Community Action Programs. However,

since neither the volunteers from the N.H. Voter Registration Coalition, nor the Manchester Board of Registrars are employees of the program *we* would not be in violation of the law. We have sought the opinion of the N.H. Attorney General's Office on this matter and as you can see from the attached letter, both Tess Petix and Gayle Hennessey were incorrect in their interpretation of the law ... I would like to request that the Manchester Board of Registrars reconsider its decision not to deputize members of the Voter Registration Coalition.

(Pl.Ex. 10, emphasis in original). The Board neither met nor ever responded to this request (Tr. 2–28).

On June 29, 1988, plaintiffs filed an action in this Court making 42 U.S.C. § 1983 claims. In their complaint, plaintiffs alleged that defendants, under color of state law, abridged their First Amendment right to free association, abridged their fundamental right to vote, denied them property and liberty without due process of law, and denied them the equal protection of the laws. In addition, plaintiffs alleged that defendant Tess Petix either misinterpreted 42 U.S.C. § 9904(c)(7) or was enforcing an unconstitutional statutory provision.

In order to redress these purported constitutional violations, plaintiffs sought essentially four forms of relief. First, plaintiffs requested that the Court declare that the Board had abridged plaintiffs' constitutional rights. Secondly, plaintiffs requested the Court to enjoin the Board to develop "reasonable, fair, non-discriminatory specific standards for determining who shall be permitted to serve as volunteer registrars." Thirdly, plaintiffs asked the Court to enter an "injunctive decree mandating that members of the People's Alliance or any other organization be permitted to serve as volunteer registrars within the City of Manchester so long as such individuals satisfy the reasonable and non-discriminatory standards." Lastly, plaintiffs prayed that the Court "enter a declaratory judgment that 42 U.S.C. § 9904(c)(7) does not prohibit plaintiffs from obtaining access to food distribution facilities ... and entering an in-

junctive decree ordering defendant Petix to send notice to that effect to all food distribution sites in New Hampshire."

On July 19, 1984, plaintiffs sought preliminary injunctive relief "compelling defendants to permit plaintiffs to assist potential voters in registering to vote ..." Objection was filed to plaintiffs' motion for preliminary injunction on July 27th. On the same day, defendants Paul R.R. Martineau, Jacqueline A. Brinn, Raoul L. Billy, Peter McDonough and Joan E. Walsh answered plaintiffs' complaint.

On August 16, 1984, Anne McDonough, President of the League of Women Voters at the time, wrote to Jacqueline Brinn requesting that the Board "deputize an additional ten (10) members to assist in voter registration." (Pl.Ex. 24). These members were appointed in order to work at a booth at the Riverfest in October of that year (Tr. 2–165). Deputy registrars were also sent to Elmwood Gardens and Rimmon Heights in October of 1984 (Pl.Ex. 27 at 79) (Tr. 3–41).

On September 7, 1984, the Court ruled on plaintiffs' motion for preliminary injunction. Senior Judge Edward S. Northrop, of the District of Maryland sitting by designation, held that plaintiffs "failed to satisfy the criteria for issuance of a preliminary injunction." Disappointed with the Court's ruling, plaintiffs filed notice of appeal on September 12, 1984. On October 16, 1984, however, plaintiffs-appellants, on their own motion, were granted leave to withdraw their appeal.

In late October 1987, plaintiffs filed two motions. The first was to delete named plaintiff Michael Pickering. Counsel for plaintiffs had made repeated efforts to locate Mr. Pickering during 1986 in order to consult with him on this action. These efforts were to no avail. No objection to this motion was filed by defendants and the motion was granted on October 30, 1987.

The second motion was a suggestion to substitute Leo Bernier and Shari Hastings as defendants in place of Joan Walsh and Peter McDonough in their capacities as members of the Board. Miss Walsh and Mr. McDonough had retired and resigned,

respectively. Again, no objection was filed by opposing counsel and the motion was granted on October 30, 1987.

This case proceeded in due course. On November 16, 1984, a Pretrial Order was entered delineating plaintiffs' theories of liability and setting a discovery schedule. Throughout the remainder of 1984, 1985 and early 1986, a substantial amount of discovery took place. This included the deposition of Jacqueline Brinn (Pl.Ex. 27) which was taken on August 20, 1985.

On November 2, 1987, plaintiffs and defendant Tess Petix entered into a consent decree which was approved by the Court on that date. In the consent decree, plaintiffs agreed to dismiss, with prejudice, the complaint against Tess Petix. In exchange, defendant consented to a plan by which plaintiffs could conduct voter registration activities at commodity lines. Since it was Tess Petix who purportedly denied plaintiffs the opportunity "to engage in First Amendment activity at food distribution centers," her dismissal effectually eliminated plaintiffs' third cause of action and request for relief from this case.

On November 3, 1987, a Final Pretrial Order was issued outlining some of the uncontested facts in the case. Two days later, the parties filed a stipulation dismissing Tess Petix from the case. Pretrial memoranda were submitted by the respective parties and the case was tried without a jury between November 5th and November 10th of 1987. After closing arguments were completed, the case was taken under advisement and a transcript was prepared. The case is, now, in order for decision.

## STANDING OF PAUL MORSE

It is a fundamental tenet of federal jurisprudence that a plaintiff must have standing to bring a particular cause of action in a federal district court. In order to establish standing for purposes of the constitutional "case or controversy" requirement, a plaintiff must show the following:

1) that he personally has suffered some actual or threatened injury

2) that the injury is a result of the putatively illegal conduct of the defendant

3) that the injury is likely to be redressed by a favorable decision

*Heckler v. Mathews*, 465 U.S. 728, 738, 104 S.Ct. 1387, 1394–95, 79 L.Ed.2d 646 (1984), *Ozonoff v. Berzak*, 744 F.2d 224, 227 (1st Cir.1984). Moreover, in considering the issue of standing, one "is not to pass on whether plaintiffs will prevail on their claims; one is to assume that the claims have minimal substance." *N.A.A.C.P., Boston Chapter v. Harris*, 607 F.2d 514, 520 (1st Cir.1979).

Plaintiff Morse claims that he offered to serve as a volunteer registrar and was denied the opportunity to engage in this important civic activity. For the purpose of discussing the issue of standing, the Court takes these claims as true. Nonetheless, plaintiff Morse has failed to show that the injury he has suffered is likely to be redressed by a favorable decision.

It is undisputed that in order to become a deputy registrar, one must be a resident of the City of Manchester (Tr. 2–175); *See* Charter of the City of Manchester Article V, section 5.19. At trial, however, it was revealed that Mr. Morse, in 1984, was a resident of the City of Concord, and had been registered to vote in that city. Within the next few years, Mr. Morse moved to the Town of Loudon where he is presently residing. Mr. Morse has never been a resident of the City of Manchester or registered to vote there.

■ To redress his purported injury— the Board's refusal to deputize him—Mr. Morse requests the Court to issue an injunction mandating that the Board promulgate reasonable and nondiscriminatory standards and to consider him for deputization under those standards. Granting this relief, however, would not redress Mr. Morse's purported injury. The Board would not, indeed could not, deputize Mr. Morse under any set of reasonable nondiscriminatory standards because he is not a resident of the City of Manchester. Mr. Morse, therefore, does not have standing to assert § 1983 claims against defendants in the present case. Consequently, his complaint against defendants must be dismissed.

## THE ALLIANCE'S CLAIMS

Before discussing the merits of the Alliance's claims, it is necessary to clarify the relationship that exists between that group, the Coalition and the claims that the Alliance alleges against defendants in this case. Although much of the testimony indicates that it was the Coalition, not the Alliance, that requested the Board to deputize Hansen, Brady, DesMarais and Duckoff, the Board, in the final analysis, voted "that no representatives of the Coalition or the Alliance be deputized to register voters in the City of Manchester." (Pl.Ex. 9). This decision reflects the fact that Mr. Morse, throughout the events precipitating this litigation, was Director of a group that functioned in two roles. The Alliance was working to increase voter registration of its own accord. It was also spearheading the effort of a broader based group, the Coalition, to deputize individuals from other member groups. Whether it was the Coalition or the Alliance that requested member deputization is a matter of semantics only. Only one group of people dealt with the Board and was turned down by the Board. For the purposes of this case, the conduct of the Coalition is that of the Alliance and vice versa. In any event, it is the Alliance that is a plaintiff in this case.

The Alliance premises its § 1983 action on the violation of four constitutional rights. 1) the right not to be denied property or liberty without due process of law 2) the right to vote 3) the right to free association and 4) the right to equal protection of the laws. As will be seen, defendants have not deprived the Alliance of any of these constitutional rights, and thus this action must fail.

### 1. Due Process

■ The Fourteenth Amendment to the United States Constitution provides that "nor shall any State deprive any person of liberty or property without due process of law." Plaintiff contends that it had a "constitutionally protected expectancy in deputi-

zation" and that defendants, by "operating without established criteria or procedures" denied it this "opportunity to participate in the electoral process" without due process of law. This contention clearly is without merit. In *Rhode Island Minority Caucus, Inc. v. Baronian*, 590 F.2d 372, 376 (1st Cir.1979), the First Circuit Court of Appeals indicated:

> There is no right, in the abstract, to be appointed to a public office, such as that of voter registrar, and similarly no right to be a sponsoring organization ...

Plaintiff then does not have a liberty or a property right to sponsor deputy registrars or to receive group deputization. Without such a right, plaintiff may not complain that the process defendant afforded it was constitutionally deficient. Plaintiff's due process claim, therefore, must be denied.

### 2. Right to Vote

█ The Alliance alleges that in refusing to appoint deputy registrars from members of its organization, defendants are pursuing a "course of conduct" that "unreasonably burdens the right to vote." On its face, this contention has no merit. No Alliance member has been deprived of the right to vote. The Alliance has no standing to complain that non-members are being impeded in registering to vote. In any event, it is evident in this case that the registration process is fully available to all potential voters and no unreasonable burden has been placed by these defendants on the right of every qualified citizen to register and ultimately vote at elections.

### 3. Right to Free Association

It is also alleged that defendants "policy and practice of selecting volunteer registrars from among the members of the League of Women Voters ... but from no other organization violates the associational and equal protection rights of plaintiff organization." These allegations reveal that whatever rights the Alliance claims defendants have violated stem from the Board's asserted "policy and practice" of deputizing members from the League but not members from other organizations.

The crux of this claim is that one has to be a League member in order to be deputized. Plaintiff, however, has failed to show that the Board only deputizes persons as volunteer registrars if they are members of the League.

█ On the contrary, the evidence is clear that defendants have never had a policy which required an applicant for deputization to be a member of the League of Women Voters. An individual was always free to apply in his or her own right. Applications could also be filed through a responsible sponsoring organization such as the Chamber of Commerce. Individual members of the Alliance, thus, could have applied to be deputy registrars in this case and asked to be judged on their own credentials. That was not done. In short, the right of free association is not implicated in this case.

### 4. The Right to Equal Protection

The Alliance's real complaint in this case boils down to this—the process for selecting deputy registrars that was in existence in 1984 was arbitrarily applied to it. It contends that it was treated differently than the League of Women Voters for no good reason. Let us examine the evidence to determine if that contention is supported.

The Board met with representatives of the Alliance on April 26, 1984. After the meeting, Paul Morse felt "very positive" that the Board was "receptive" to the issue of deputizing members of the Alliance (Tr. 2–39). Testimony of the Board members reveal that Morse's feeling reflected their own at this point in time. Paul Martineau indicated that while he was concerned about the partisanship nature of some Coalition members, he would have voted for deputization. Miss Walsh testified that while she was concerned about the appearance of distributing cheese to entice voters to register, she was "neutral" on the issue of "deputization." Mr. McDonough held a similar "neutral" position. Mrs. Brinn, in Mr. Morse's own words, initially, was "very pleased" that the Alliance was "bringing in additional people." At the time of the

April 26th meeting, Mrs. Brinn "had no feeling one way or the other" on the issue of deputization (Pl.Ex. 27 at 133). Lastly, Mr. Billy, for the most part, adopted the recommendations of Miss Walsh and Mrs. Brinn (Tr. 2–206).

From these facts, it is evident that the Board did not exclude the Alliance on the basis of its non-League status. Almost until the very moment of their decision, all Board members were open to the idea of deputizing Alliance members even though they did not belong to the League. Plaintiff then has failed to prove that the Board implemented a "policy" or "practice" which denied it constitutional rights on the basis of its group status.

If group status was not the foundation of the Board's decision, what then were the criteria that the Board used to determine whether deputization was appropriate in a particular instance? The evidence reveals that there were two guidelines. First, the representatives of the group the Board was dealing with had to possess the earmarks of honesty and integrity (Tr. 2–176). Secondly, they had to be willing to follow the Board's directions scrupulously (Tr. 2–176) (Pl.Ex. 27 at 131).

Plaintiff does not challenge the constitutionality of these criteria on their face. Rather, the Alliance claims that these criteria were "arbitrarily and capriciously" applied to it so as to improperly categorize the Alliance as "uncooperative" and "dishonest." The evidence, however, reveals precisely the contrary. The petitioning group concealed a matter of vital importance to the Board and individual members of that group indicated that they would not follow the Board's directions regarding the voter registration process.

In January of 1984, the Alliance wrote to members of the Board requesting to meet the Board in order to explore the possibility of registering voters in commodity lines on January 31st and February 1st. Although subsequent contacts between the Board and the Alliance did focus upon deputization in general, the main thrust of the Alliance's effort through the Board's May 17th decision was cheese line deputization.

The Alliance's May 9th letter to the Board indicates as much.

In that letter, Mr. Morse stated it was "vital" to the Alliance's planning regarding the upcoming cheese line distribution (Manchester May 22 to May 25) to know who the Board would be deputizing. Mr. Morse went on to emphasize that the cheese distribution was looked upon as the Alliance's "most important activity."

Having made cheese line deputization the focus of its request, who would not be perturbed to find that very activity at issue was of questionable legality and that those requesting deputization knew of this fact? On May 16th, Miss Walsh received a call from Nick Lorang. He advised Miss Walsh of the Tess Petix letter which forbade cheese line registration. Mr. Lorang also told Miss Walsh that he had spoken to Mr. Morse who, in turn, had indicated knowledge of the Tess Petix letter. On this basis, the Board denied the Alliance's request for deputization on the premise that the Alliance "[was] in fact, aware of the regulation."

Testimony at trial supports this conclusion. Mrs. Brinn through her deposition testified that the Alliance was turned down because it had intentionally concealed information (the Tess Petix ruling) from the Board that was vital to the Board's decision on the issue of cheese line deputization (Pl.Ex. 27 at 135). Joan Walsh (Tr. 2–137, 138), Paul Martineau (Tr. 2–195), and Peter McDonough (Tr. 3–33) voted against the Alliance for the same reason. Raoul Billy again in this instance followed the lead of Walsh and Brinn.

As it turned out, the condition for denial contained in the Board's letter never became operative. The hearsay information upon which the Board based a large part of its decision was accurate. Mr. Morse admitted as much when he telephoned Miss Walsh to protest the Board's decision. Similarly, the May 21st letter from Janet Schaffer to the Board conceded that the Alliance had been aware of the Tess Petix letter when it submitted its request for cheese line deputization.

The process by which the Board characterized the conduct of the People's Alliance was not arbitrary. Nick Lorang's information was highly accurate and was in fact judged by the Board upon the criterion of honesty. Moreover, the method of conditioning denial of deputization upon the accuracy of the information limited the potential harm that could arise from hasty action on the Board's part. All in all, the Board's decision-making was completely reasonable even though it depended, to some degree, on the informal channels of communication that permeate the local political processes.

The Alliance's lack of candor on the issue of cheese line voter registration was compounded by one of its representative's comments at the April 26th meeting. During that meeting Mrs. Brinn asked Sister Helen Girard whether the Alliance would follow the Board's guidelines, go where the Board told them if they were indeed deputized. Sister Girard answered, "For awhile."

Unlike the process by which the Board learned of the Tess Petix letter, this comment was made directly to the Board by a member of the Alliance. The Alliance cannot complain, therefore, that the Board's criteria for deputization were arbitrarily applied to it. The Alliance told the Board themselves that they would not follow the Board's orders in the future.

The evidence shows that the Alliance concealed important facts and also evinced an unwillingness to follow the Board's instructions. Since this is the case, there is no basis for plaintiff to claim that the criteria in existence at the time of the Board's May 17th decision were arbitrarily applied to it. There was a rational basis, *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971) for the Board treating the Alliance differently than the League in the matter of deputization of voter registrars. Therefore, the Alliance has failed to state a right to any relief in this proceeding.

### THE DESMARAIS, HANSEN AND DUCKOFF CLAIMS

Plaintiffs, DesMarais, Hansen and Duckoff made no individual application to the Board to be deputized. Rather, each gave permission to and relied on the Alliance to submit their respective names to the Board as potential candidates for deputization. On May 9, 1984, Paul Morse, as a representative of the Alliance sent a letter to the Board formally submitting the names of those three individuals for deputization. His request was denied May 17, 1984.

Clearly these individual plaintiffs stand in the shoes of the Alliance. It was the Alliance that dealt with the Board and whose request was turned down, not the individual plaintiffs. In such a posture, the claims of these plaintiffs must be disposed of in the same manner as those of the Alliance. They were denied no constitutional rights. They are not entitled to any form of relief, individually.

In making this decision, it is worthy to note that this would be a far different case had any of the individuals applied to the Board in their individual capacities and been denied deputization because of their association with the Alliance.

For example, if Mr. Duckoff had requested the Board in writing to consider deputizing him as a volunteer registrar, and, he had he been turned down because he was a member of the Alliance, then his § 1983 claims would have had some substance. But that was not the case here.

Clearly DesMarais, Hansen and Duckoff did not apply individually to the Board for deputization. The Board, then, did not judge their individual credentials to be registrars. Therefore, the individual plaintiffs have no independent basis upon which to claim unconstitutional conduct on the part of the Board.

### CONCLUSION

For the above reasons, all requests for relief by the plaintiffs in this action are denied. The Clerk will enter judgment for defendants on all counts of the complaint.

*It is so Ordered.*